Gertrude P. FULLER et al., Plaintiffs,

v.

Austin A. VOLK et al., constituting the Board of School Estimate of the City of Englewood, the City of Englewood, and John H. Perry et al., constituting the Board of Education of the City of Englewood, Defendants.

Jerry Volpe et al., Intervening Plaintiffs,

and

Frederick M. Raubinger, Commissioner of Education of the State of New Jersey,

Kenneth Ancrum et al.,

and

Deborah Spruill, Intervening Defendants.

Civ. No. 847–63.

United States District Court
D. New Jersey.
June 3, 1964.

**26**

Vorsanger & Murphy, by James T. Murphy, Englewood, N. J., for plaintiffs.

Breslin & Breslin, by John J. Breslin, Jr., Hackensack, N. J., Sidney Dincin, Englewood, N. J., for defendants.

Major & Major, by James A. Major, Hackensack, N. J., for intervening plaintiffs Jerry Volpe, and others.

Arthur J. Sills, Atty. Gen. of New Jersey, by Joseph A. Hoffman, Deputy Atty. Gen., Trenton, N. J., for intervening defendant Frederick M. Raubinger.

Herbert H. Tate, Newark, N. J., and Barbara A. Morris, New York City, for intervening defendants Kenneth Ancrum, and others.

Morton Stavis, Newark, N. J., and William M. Kunstler, New York City, for intervening defendant Deborah Spruill.

AUGELLI, District Judge.

The plaintiffs in this case challenge the validity of a plan (hereinafter called the "Plan") adopted by the Englewood Board of Education on July 29, 1963, entitled "PROPOSAL OF A PLAN TO COMPLY WITH THE DECISION OF THE STATE COMMISSIONER OF EDUCATION OF NEW JERSEY DIRECTING THE ENGLEWOOD BOARD OF EDUCATION TO REDUCE THE EXTREME CONCENTRATION OF NEGRO PUPILS IN THE LINCOLN SCHOOL".

The following facts are based on a stipulation made in open court on December 16, 1963, and on the several exhibits marked in evidence on that date, including a map showing the school attendance areas in Englewood prior and subsequent to the effective date of the Plan.

The School District of the City of Englewood is organized under the pro-

visions of Chapter 6 of Title 18 of the Revised Statutes of New Jersey, N.J.S.A. 18:6–1 et seq. The Englewood Board of Education consists of five members appointed by the Mayor, and its funds for operation of the schools are subject to approval by the Board of School Estimate.

The City of Englewood is a community with a population of approximately 30,000 people, and has a geographical area which measures roughly 2.7 miles in length and 2.3 miles in width. The City has one junior high school, attended by children in grades 7, 8 and 9; and one senior high school, attended by children in grades 10, 11 and 12.

The controversy in this case centers around the elementary schools of Englewood, with its focus on the Lincoln School where the enrollment was composed almost exclusively of Negro children.

Prior to the adoption of the Plan, there were five elementary schools in Englewood, kindergarten through sixth grade, to which pupils were assigned generally on the basis of residence in certain designated attendance areas. As of September 19, 1962, these schools, their enrollment, and racial composition, were as follows:

| School | Enrollment | % White | % Negro |
|--------|------------|---------|---------|
| Cleveland | 477 | 99.6 | .4 |
| Liberty | 418 | 38.0 | 62.0 |
| Lincoln | 505 | 2.0 | 98.0 |
| Quarles | 343 | 96.8 | 3.2 |
| Roosevelt | 345 | 85.5 | 14.5 |

Prior to the commencement of this litigation, the intervening defendants herein, Spruill and Ancrum et al., filed petitions with the Commissioner of Education of the State of New Jersey, in which they charged the Englewood Board of Education with the maintenance of racially segregated schools and with refusal to consider plans, including a proposal for a central intermediate school, to eliminate such racial segregation. The intervening plaintiffs herein, Volpe et al., were permitted to intervene in the proceedings before the Commissioner. They objected to the establishment of a central intermediate school, and sought to restrain the Board of Education from violating the neighborhood school principle and from expending public funds in furtherance of the changes demanded by the Spruill and Ancrum petitioners.

The Englewood Board of Education denied that it was guilty of intentional segregation or discrimination. It asserted that educational opportunities afforded Englewood children were equal, regardless of the school attended. The Board also pointed out that the racial imbalance that existed at the Lincoln School resulted not from any action attributable to the Board, but from the fact that the neighborhood in which the school was located was inhabited by a predominantly Negro population.

In an opinion dated July 1, 1963, the Commissioner directed the Englewood Board of Education to formulate a plan to reduce the extreme concentration of Negro pupils in the Lincoln School; to submit such plan to the Commissioner for approval on or before August 1, 1963; and to put a plan, as approved, into effect at the beginning of the 1963–64 school year. This decision was based upon the Commissioner's determination that the pupil assignment policies then in force in the Englewood School District resulted in an extreme concentration of Negro children in the Lincoln School; that attendance at the almost exclusively Negro Lincoln School engendered feelings and attitudes in pupils which tended to inter-

fere with learning; that such continued concentration of Negro pupils as existed at the Lincoln School constituted a deprivation of educational opportunity under New Jersey law for those pupils compelled to attend that school; and that reasonable and practicable means, consistent with accepted educational and administrative practice, could be devised to reduce the racial concentration in the Lincoln School. The Commissioner also found that there was no evidence in the case before him of any deliberate attempt by the Englewood Board of Education to segregate the pupils in its public schools by race.

Acting pursuant to this decision by the Commissioner, the Englewood Board of Education formulated the aforementioned Plan, and submitted it to the Commissioner for approval. The Commissioner approved the Plan on August 1, 1963. The Plan directed the Board to take the following action:

"1. To establish at the former Junior High School building at 11 Engle Street, a city-wide sixth-grade school to which the Board assigns all sixth grade pupils of the Englewood Public schools,

"2. To assign all pupils of grades one through five residing in the Lincoln School attendance district to the Cleveland, Quarles and Roosevelt Schools, such assignment to be determined by the Superintendent on the basis of the following criteria:

"a) define attendance districts so that children of the Lincoln School district will be assigned as nearly as possible, to the school nearest their homes,

"b) provide for an even distribution of class loads,

"c) to permit the children whose parents wish them to remain at the Lincoln School to remain there provided that it is administratively and educationally practicable to do so.

"3. As a prerequisite to the establishment of the city-wide sixth-grade school referred to in Paragraph (1),

either of the following two conditions must occur:

"1) 125 or more present students of Lincoln School must NOT elect to remain for the 1963–64 term at Lincoln School

or

"2) The number of transfers from Lincoln School will result in class loads in Quarles, Cleveland, or Roosevelt Schools which, in the opinion of the Board of Education, are educationally undesirable.

"4. To assign to Lincoln School all children of Kindergarten age residing in the present Lincoln School district.

"5. To transfer the central administrative offices of the Board of Education to the Lincoln School.

"6. To instruct the Superintendent to proceed immediately with all necessary arrangements, notices and procedures consistent with the laws of the State of New Jersey to execute these directives."

Meanwhile, on July 16, 1963, the Volpe group had filed an appeal from the Commissioner's decision of July 1 to the State Board of Education. The State Board affirmed the Commissioner's decision, and from that determination the Volpe group appealed to the Appellate Division of the Superior Court of New Jersey, which appeal has since been withdrawn. In addition, the Volpe group, as well as the Fuller plaintiffs in this action, filed complaints in the Chancery and Law Divisions of the Superior Court of New Jersey, in which they sought to enjoin the expenditure of funds to implement the Plan. Injunctive relief was denied to the Volpe and Fuller plaintiffs, and appeals taken from these decisions are presumably still pending.

Following the Commissioner's approval of the Plan, Dr. Mark R. Shedd, the Englewood Superintendent of Schools, sent to the parents of the 325 pupils in grades one through five of the Lincoln School a letter and questionnaire, in which the parents were asked to indicate whether

they desired their children to remain at the Lincoln School or be assigned to the Cleveland, Quarles or Roosevelt Schools. The returns from these questionnaires, as of August 21, 1963, showed 242 acceptances of assignments out of the Lincoln School and 21 preferences to remain at Lincoln.

On August 19, 1963, the Board of School Estimate certified the sum of $53,000.00 to implement the Plan, which sum was transferred by the City of Englewood to the Board of Education on or about September 11, 1963. In addition, $50,000.00 of bond money was transferred by the Board of Education from the Improvement Authorization Account to the Capital Outlay Account. The total sum of $103,000.00 was allocated as follows:

| | |
|---|---:|
| Building renovation at 11 Engle Street | $50,600.00 |
| Equipment for 11 Engle Street | 10,000.00 |
| Moving Board offices from 11 Engle Street to Lincoln School | 700.00 |
| Temporary classrooms at Cleveland School | 5,200.00 |
| Faculty preparation | 3,500.00 |
| Pre-kindergarten program | 6,000.00 |
| Higher Horizons | 25,000.00 |
| Adult education | 2,000.00 |

———◆———

When the 1963–64 school term opened on September 4, 1963, approximately 125 Lincoln School pupils, grades one through five, were assigned to the Cleveland, Roosevelt and Quarles Schools in accordance with the Plan. The full Plan did not go into effect at this time because the renovation of the building at 11 Engle Street had not yet been completed.

The Fuller plaintiffs filed their complaint in this Court on October 11, 1963. They named as defendants the City of Englewood, and the members constituting the Board of School Estimate and the Board of Education of that City. Plaintiffs sought to enjoin the appropriation and expenditure of public funds to implement the Plan, and to have such appropriation and expenditure, as well as the Plan itself, declared unconstitutional and unlawful. They predicated their right to relief on the Fourteenth Amendment and their status as taxpayers of the municipality.

The Fullers complained that, under the Plan, the neighborhood school policy, pursuant to which children beneath the junior high school grades had been assigned to attend schools on the basis of residence within a particular attendance area, regardless of race, was abandoned; and that children from the entire city were now required, because of racial considerations, to attend a sixth grade school in the industrial area of Englewood at 11 Engle Street. They also complained that they were unduly discriminated against on account of race, because the children in grades one through five in the elementary schools, other than Lincoln, were not given a right to vote on the effectiveness of the Plan. Another objectionable feature of the Plan, according to plaintiffs, was that the children residing in the attendance areas of the elementary schools, other than Lincoln, were not permitted to attend schools outside of their previously established attendance areas. These latter two provisions, it was alleged, denied equal protection of the laws to the pupils in four out of the five attendance school areas, and gave a preference to the Lincoln School pupils that was based solely on race and color.

On October 14, 1963, plaintiffs obtained from this Court an order directing defendants to show cause why they should not be enjoined from appropriating or

expending public funds to implement the Plan. At the hearing on October 21, 1963, the order to show cause was discharged on the basis of an agreement among the parties that defendants spend no additional money, other than for normal operating expenses, in furtherance of the Plan, and that every effort would be made to fix an early date for final hearing. In addition, at this hearing, the Volpe group was permitted to intervene as plaintiffs in the action, and the Commissioner of Education was allowed to intervene as a defendant.

A motion by the Commissioner to dismiss the complaint for lack of jurisdiction was also heard on October 21, 1963, and denied. Subsequently, the Commissioner applied for leave to file an interlocutory appeal from this decision, which also was denied. Thereafter, the Commissioner, who had not joined in the above-mentioned October 21 agreement, made applications to the Court of Appeals for this Circuit and to the United States Supreme Court for leave to petition for a writ of prohibition on the jurisdictional issue. The Court of Appeals denied the Commissioner's application on December 3, 1963, and the Supreme Court took like action on April 20, 1964.

On October 28, 1963, the renovations at 11 Engle Street were completed, and the remainder of the Plan went into effect, as follows: all sixth grade pupils in Englewood were assigned to the 11 Engle Street School; the remaining pupils at Lincoln School, grades one through five, were assigned to the Roosevelt, Quarles and Cleveland Schools; Lincoln was eliminated as an elementary school, except for the kindergarten grade and trainable classes; and finally the offices of the Board of Education were established at Lincoln.

As of November 12, 1963, after the assignments contemplated by the Plan had been made, the composition of the student body, grades one through six, of the elementary schools in Englewood was as follows:

| School and Grades | Number of Pupils | % White | % Negro |
|---|---|---|---|
| Engle Street (6) | 290 | 58.3 | 41.7 |
| Cleveland (1–5) | 547 | 66.3 | 33.7 |
| Liberty (1–5) | 283 | 39.0 | 61.0 |
| Roosevelt (1–5) | 310 | 65.8 | 34.2 |
| Quarles (1–5) | 301 | 81.4 | 18.6 |

On November 15, 1963, the Volpe intervening plaintiffs, as parents of children attending the Englewood public schools and as taxpayers, filed their complaint, in which they joined in the prayers for relief in the Fuller complaint filed on October 11, 1963, and additionally sought to restrain the Englewood Board of Education and the Commissioner of Education from interfering with the attendance of their children at their neighborhood schools. These plaintiffs alleged that, under the Plan, their children, solely because of color, were no longer permitted to attend the school located in their neighborhood, and were required to attend a sixth grade school established for the sole purpose of forcibly intermixing white pupils with Negro pupils. They complained that the Plan became operative by vote of the Negro first through fifth graders of Lincoln School, and that no opportunity was given to students in the other elementary schools to vote on the effectiveness of the Plan. They claimed that the Plan, therefore, resulted in a violation of rights secured to them and to their children by the Fourteenth Amendment.

The Fuller plaintiffs have now moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The intervening Volpe plaintiffs joined

in the motion. Affidavits for and against the motion have been filed. A hearing was held on January 23, 1964. The Englewood Board of Education took the position that the existence of disputed questions of fact would preclude the granting of the summary judgment motion, but suggested that if the Court concluded otherwise, the state of the record was such as to justify summary judgment in favor of the defendants. The other defendants also contended that there were disputed issues of fact, and that there should be a final hearing for the purpose of adducing additional proofs. In addition, at this hearing, a motion by the intervening defendant Spruill, joined in by the intervening Ancrum defendants, to dismiss the complaint or, in the alternative, to stay further proceedings in this Court, was denied. Leave to appeal from this determination was also denied.

A consideration of the affidavits filed on the summary judgment motion is now in order. The affidavit filed by the plaintiff Gertrude P. Fuller in support of the motion adds nothing to the stipulation of facts and the allegations of her complaint, which have been discussed earlier in this opinion. The affidavits filed on behalf of the intervening defendants Ancrum and Spruill likewise make no factual contribution to the case. These affidavits merely seek to show that additional factual as well as expert testimony should be taken on the question of the reasonableness of the Plan before the Court undertakes to decide the case.

In an affidavit filed on behalf of the Englewood Board of Education, Dr. Shedd states that race, creed, and color are in no way considered in making assignments of children to the public schools of Englewood; that in connection with the Plan, all sixth grade children in Englewood were assigned to the Engle Street School, without regard to color or to the desires of their parents; and that the reasons only the parents of the Lincoln School children, grades one through five, were given the right to vote the Plan into effectiveness were that theirs were the children who, according

to the Commissioner's decision of July 1, 1963, were being denied equal educational opportunity, and that theirs were the children who, if they so chose, would be moved out of Lincoln School to attend a different school. Dr. Shedd, who holds a degree of Doctor of Education from Harvard University and has had thirteen years of experience in teaching and in school administration, gives his expert opinion that the Plan is educationally sound. He also points out that, in any event, the continued use of Lincoln as an elementary school was limited, because of its age and physical condition. He further states that the educational opportunities for the children assigned to the city-wide, sixth grade school at Engle Street are superior to opportunities previously available at the individual elementary schools, because of the pooling and consolidation of resources. Finally, according to Dr. Shedd, the distances traveled to the Engle Street School and the conditions of travel do not constitute undue hardship or safety hazards for the children.

In the affidavit filed by the Commissioner, he recites that he appointed a committee of six expert educators to make a study of the situation existing in the Englewood public schools, and sets forth a brief biographical profile of the members of the committee. This committee submitted a report to the Commissioner on October 5, 1962. The report, which the Commissioner states he considered in preparing his decision of July 1, 1963, disclosed that, among the Negro pupils at the Lincoln School, achievement scores were lower, retentions in grade were higher, high school records of graduates were poorer, and drop-outs among graduates were higher, as compared with the Negro and white pupils in the other elementary schools. The Commissioner states that, in his opinion, "a stigma attaches to attendance at a school whose enrollment is completely or almost exclusively Negro and that this sense of stigma and resulting feelings of inferiority have an undesirable effect upon attitudes related to learning." The Com·

missioner found that these conditions existed at the Lincoln School, not due to any deliberate action by the Englewood Board of Education, but because of the segregated living pattern of the neighborhood. Notwithstanding the lack of intentional action by the Board, the Commissioner was of the opinion that since several reasonable solutions existed, the Board was under a legal obligation to take appropriate steps to mitigate or eliminate these conditions at the Lincoln School. Finally, the Commissioner states he believes that the Plan is an educationally sound method of carrying out its objective.

The Court is satisfied from an examination of the record made in this case that the material facts necessary to decide the constitutional issue raised by the pleadings are not disputed, and that therefore there is no need to delay the matter further by the taking of additional proofs. The provisions of the Plan have already been recited in this opinion. The circumstances surrounding the adoption and operation of the Plan, its purpose to reduce the extreme concentration of Negro pupils in the Lincoln School, and its effect on the racial composition of the individual schools in Englewood have all been stipulated. Even the evidence that the Plan is educationally sound has not been challenged. The constitutional issue, put simply, is whether or not the Plan, in its operation, deprives plaintiffs of any of the rights secured to them by the Fourteenth Amendment to the United States Constitution.

The plaintiffs, who acknowledge that the material facts in this case are free from dispute, contend that these facts demonstrate that the Plan was adopted solely out of racial considerations, that it discriminates against the white pupils because of their color, and that it is, therefore, unconstitutional. Plaintiffs argue that since in this case the school attendance areas were honestly drawn without regard to race or color, and racial imbalance in the schools resulted because such attendance areas are populated almost entirely by Negroes, there is no af-

firmative duty on the part of the Englewood Board of Education to blend Negro and white pupils in any particular school to eliminate such racial imbalance. Since the Constitution is supposed to be "colorblind", plaintiffs argue, the state is constitutionally prohibited from requiring the Board to take racial factors into consideration in order to eliminate the extreme concentration of Negro pupils in a particular school.

It cannot be seriously disputed that racial considerations were a motivating factor in the formulation of the Plan. The school attendance lines in this case were redrawn to eliminate the condition that the Commissioner found to exist at the Lincoln School. This poses the question as to whether or not a local board of education may take race into consideration in redrawing school attendance lines in order to reduce the extreme concentration of Negro pupils in one of its public schools, where such concentration admittedly resulted, not from deliberate state action, but from de facto or adventitious segregation.

Plaintiffs place great reliance on the case of Bell v. School City of Gary, Indiana, D.C.Ind., 213 F.Supp. 819, aff'd. 324 F.2d 209 (7 Cir. 1963), cert. den. 84 S.Ct. 1223 (1964). That action was brought on behalf of Negro children to enjoin the maintenance of racially segregated public schools in Gary, Indiana. The evidence satisfied the district court that there was no intent or purpose on the part of the defendant to segregate the races in certain schools. The plaintiffs in that case contended that, regardless of the motive or intent of the defendant, actual segregation of the races existed in the schools because a large percentage of the Negro children were required to attend schools that were totally or predominantly Negro in composition, whereas a large percentage of the white students attended schools that were totally or predominantly white. They took the position that there was an affirmative duty on the part of the defendant to integrate the races so as to bring about, as nearly as possible, a racial balance in each of

the schools in the Gary school system. The district court, in rejecting these arguments and dismissing the complaint, held that the defendant did not have an affirmative constitutional duty to alter racially segregated attendance districts, resulting from the application of the neighborhood school policy in residentially segregated areas. On appeal, the Court of Appeals for the Seventh Circuit affirmed, and the Supreme Court denied certiorari on May 4, 1964.

Several other federal courts have taken the same view as the court in Bell on this question of the constitutionality of de facto segregation. Briggs v. Elliott, 132 F.Supp. 776 (E.D.S.C.1955); Henry v. Godsell, 165 F.Supp. 87 (E.D.Mich. 1958); Evans v. Buchanan, 207 F.Supp. 820 (D.Del.1962); Webb v. Board of Education of City of Chicago, 223 F.Supp. 466 (N.D.Ill.1963). Some courts have disagreed. Blocker v. Board of Education of Manhasset, New York, 226 F. Supp. 208 (E.D.N.Y.1964); Branche v. Board of Education of Hempstead, 204 F.Supp. 150 (E.D.N.Y.1962); Jackson v. Pasadena City School District, 59 Cal. 2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963).

In each of the above cited cases involving this issue of the constitutionality of de facto segregation, Negro plaintiffs sought to compel local boards of education to take affirmative action to reduce or eliminate de facto segregation in the public schools. Here, the Englewood Board of Education has already acted, and white plaintiffs are now seeking to have that action set aside. Thus, under the particular facts of this case, the issue before this Court is not whether a local board of education must or is constitutionally required to act, but rather whether a board may or is not constitutionally prohibited from acting.

Since the summary judgment motion was argued, both the Supreme Court of New Jersey and the Court of Appeals of New York have handed down decisions in cases that have quite similar factual situations to the case at bar.

In Morean v. Board of Education of Montclair, 42 N.J. 237, 200 A.2d 97, the New Jersey Supreme Court held that, in formulating a plan which provided for closing down one school and transferring its students to other schools in the school district, a local board of education could take racial factors into consideration, where the board's moving purpose was in furtherance of the constitutional mandate against segregated schools and where all pupils were treated in an equal and reasonable manner. In that case, a number of white pupils attending the Montclair schools alleged that they had been discriminated against, since the pupils in the closed junior high school were given a choice as to which of the three other junior high schools they could attend. The white pupils claimed that the Board of Education was applying a double standard of pupil assignment, since they were required to attend their neighborhood schools while the pupils from the closed school, which had a Negro population of approximately 90%, were permitted to attend schools outside their neighborhood. The white students argued that this double standard of pupil assignment was racially motivated, with the object of bringing about racial balance in the junior high schools in Montclair, and therefore was discriminatory and in violation of the equal protection clause of the Fourteenth Amendment.

In Balaban v. Rubin, 14 N.Y.2d 193, 250 N.Y.S.2d 281, 199 N.E.2d 375, the Court of Appeals of New York held that a local board of education could take racial factors into consideration in establishing school attendance zones, where the plan adopted excluded no one from any school and had no tendency to foster or produce racial segregation. In that case, a number of white school children in Brooklyn claimed that they were being discriminated against, by reason of their inclusion within the school attendance area of a newly-established junior high school for the purpose of bringing about a racial balance in that school.

 This Court is in agreement with the principle enunciated in the fore-

going state court decisions that a local board of education is not constitutionally prohibited from taking race into account in drawing or redrawing school attendance lines for the purpose of reducing or eliminating de facto segregation in its public schools. In Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court of the United States determined that racial segregation in the public schools violates the equal protection clause of the Fourteenth Amendment, in that such segregation discriminates against Negro pupils. In essence, a principal contention of plaintiffs in this case seems to be that racial integration violates the equal protection clause of the Fourteenth Amendment because such integration discriminates against white pupils. Plaintiffs have not shown, nor does this Court believe, that racial integration, per se, discriminates against white pupils. Only if specific provisions of the Plan do in fact discriminate against plaintiffs because of their race, could it be said to result in an infringement of their constitutional rights.

Plaintiffs allege that there are three specific forms of racial discrimination against white pupils in the Plan. First, all sixth grade pupils in Englewood are required to attend the Engle Street School, which is located outside the previous attendance areas of some of these pupils. Second, the pupils in the elementary schools, other than Lincoln, were not given the right to vote on whether or not the Plan would become effective. Third, these other pupils, unlike those attending grades one through five at the Lincoln School, were not given the privilege of attending a school outside their neighborhoods.

■ Viewing the Plan as a whole, and taking into consideration the factual background leading up to its adoption and the objectives sought to be achieved thereby, it is difficult to see wherein the Plan is unreasonable or discriminatory in its application. The city-wide, sixth grade school established at 11 Engle Street applies equally to all Englewood sixth graders, and no hardships are shown to have been suffered by plaintiffs or their children as a result of this provision. It is no different in principle from the single, city-wide junior and senior high schools which exist in Englewood. While the right to vote on the effectiveness of the Plan was limited to the parents of the children in grades one through five in the Lincoln School, these were the children whom the Board proposed to move out of their neighborhood school, and therefore were the most logical ones to be consulted. The assignment of these children to the other elementary schools in Englewood was determined under the Plan by the Superintendent of Schools on the basis of certain criteria, which took into consideration an even distribution of class loads and distances of the other elementary schools from the residences of the relocated Lincoln School students. Finally, it is unrealistic to argue that since the students at the Lincoln School, grades one through five, were given an opportunity to attend schools outside their neighborhood, similar opportunity must be given to the pupils in the same grades in the other elementary schools to attend schools outside their neighborhoods. In the opinion of this Court, any discrimination that may be said to exist in this case is not of constitutional dimensions.

■ Moreover, plaintiffs have made no showing that they have been harmed by the operation of the Plan. As taxpayers, plaintiffs must establish that their tax moneys are being spent for an invalid purpose. See Doremus v. Board of Education of the Borough of Hawthorne, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952); Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); Crampton v. Zabriskie, 101 U.S. 601, 25 L.Ed. 1070 (1880). As parents, they must establish that their children are being discriminated against to their injury under the Plan. See Blocker v. Board of Education of Manhasset, New York, D.C.N.Y., 226 F.Supp. 208, 227. Plaintiffs have failed

in both these particulars. This Court finds no evidence that plaintiffs have been harmed in a constitutionally recognized way, either as taxpayers or as parents, by the action taken by the Englewood Board of Education in this case.

■ Under these circumstances, plaintiffs' motion for summary judgment must be denied. Although defendants have not formally moved for summary judgment, the Court believes, as the Englewood Board of Education suggests, that it may enter summary judgment for defendants. See 6 Moore's Federal Practice, ¶ 56.12 (2nd Ed. 1953). Since the Court has already determined that there exists no genuine issue of material fact to be tried and that defendants are entitled to a judgment as a matter of law, summary judgment will be entered in favor of defendants against plaintiffs. Counsel for defendant Englewood Board of Education will please submit an appropriate order on notice to all counsel.