In the Matter of REMO J. ADDABBO, Individually and as the Parent and Natural Guardian of RAYMOND ADDABBO, an Infant, et al., Appellants, v. JAMES B. DONOVAN et al., Constituting the Board of Education of the City of New York, et al., Respondents.

Second Department, January 11, 1965.

*Bernard Kessler* for appellants.

*Leo A. Larkin, Corporation Counsel* (*Seymour B. Quel, Joseph M. Callahan, Jr.,* and *Sidney P. Nadel* of counsel), for respondents.

BELDOCK, P. J. In *Matter of Balaban* v. *Rubin* (20 A D 2d 438, affd. 14 N Y 2d 193) a new junior high school was constructed in a fringe area, and the Board of Education fixed the attendance zone for the new school in such a manner as to effect a better racial balance therein. The plan was upheld against an attack by white parents who claimed that their children were being discriminated against by their inclusion within the attendance zone so drawn.

In the case at bar the Board of Education has attempted to achieve a better racial balance by " pairing " two elementary schools in a fringe area. In addition, however, as shown more fully below, by the pairing plan the board has attempted to reduce the overcrowding and to improve the facilities in both schools. The petitioners, who are white, are seeking to invalidate the board's pairing plan on the ground that it infringes upon their constitutional and statutory rights.

Public School 149 in Jackson Heights in Queens County is located on 34th Avenue between 93rd and 94th Streets. Prior to the determination under review, its attendance zone extended from 84th to 98th Streets and from 37th Avenue to Northern Boulevard — about 14 blocks from east to west and three long blocks from north to south.

Public School 92 in the Corona section of Queens County is located on 34th Avenue between 99th and 100th Streets — about six short blocks away from Public School 149. Before the determination under review, its attendance zone (contiguous to that of Public School 149) extended from 98th to 106th Streets and from 35th Avenue to 32nd Avenue — about eight short blocks from east to west and three long blocks from north to south.

Prior to the adoption of the "pairing" plan, both schools had classes from the kindergarten through the sixth-year grade.

On June 3, 1964 the Board of Education adopted a plan to pair the two schools, Public School 149 and Public School 92, effective September 14, 1964. Pairing in this case meant the following: (1) kindergarten classes were to be maintained at both schools, with the same attendance zones as had existed prior to the pairing plan; (2) grades 1 and 2 were to be maintained only at Public School 92 for a new combined attendance zone; (3) grades 3, 4, 5, and 6 were to be maintained only at Public School 149 for the new combined attendance zone; (4) the westerly end of the former Public School 149 zone, namely from 84th to 89th Streets, was annexed to an attendance zone for a school not here involved; (5) the easterly end of the former Public School 92 zone, namely from 104th to 106th Streets, was also annexed to an attendance zone for a school not here involved; (6) the combined attendance zone for Public School 92 and Public School 149 was to comprise the area between 89th and 104th Streets (about 15 short blocks); the northerly and southerly boundaries were to remain as they had been.

This pairing plan has resulted in the transfer from Public School 149 to Public School 92 of some grade 1 and grade 2 children who live closer to Public School 92 than to Public School 149, and of some who live equidistant from both schools. Of 1,425 children transferred from one school to the other, only 29 are entitled to, and receive, busing because they live slightly over a half mile from the school to which they were transferred. Except for these 29, all the other children live within walking distance of the school which they are now required to attend.

The primary reason for the pairing was to achieve racial balance. Before the pairing Public School 149 was 88% white and 12% Negro and Puerto Rican; after the pairing it will be 75% white, and 25% Negro and Puerto Rican. Before the pairing Public School 92 was 99.5% Negro and Puerto Rican and .5% white; after the pairing it will be 48% Negro and Puerto Rican, and 52% white.

Petitioners are the parents of 11 white children who would have attended grades 1 and 2 in Public School 149 had the plan not been adopted. Ten of the children were transferred to Public School 92 under the pairing plan. The child of one petitioner does not live in the present combined attendance zone and, therefore, does not attend Public School 92. No busing of petitioners' children is required because they all live less

than a half mile from Public School 92. However, petitioners' children all live closer to Public School 149 than to Public School 92; all of them must pass Public School 149 on their way to Public School 92.

The attack on the plan is that: (1) its motivation was *solely* on the basis of race; (2) pupils in grades 1 and 2 were transferred from Public School 149 to Public School 92 solely because they were white; (3) pupils in grades 3, 4, 5, and 6 were transferred from Public School 92 to Public School 149 solely because they were Negro; and (4) therefore, the children are excluded from the schools they would otherwise be attending, and that such exclusion rests *solely* on the basis of race, in violation of the Federal and State Constitutions and the Education Law.

In opposition to the petition, Superintendent of Schools Calvin E. Gross states: (1) that the betterment of ethnic balances in the schools improves the quality of education for all children, not only for those of underprivileged or minority groups; (2) that all children must learn to live in a multi-racial and multi-cultural city, country, and world, and the younger they learn to do so the better; (3) that racially imbalanced schools are educationally undesirable; (4) that all reasonable and feasible efforts should be undertaken to improve ethnic balances in the public schools; (5) that the pairing of these two schools satisfies the several educational criteria governing the zoning of schools; (6) that class sizes will be reduced; (7) that each school will receive many additional educational and professional services; (8) that ethnic imbalances will be substantially overcome; (9) that the close proximity of the two schools ideally suits them for the establishment of a common zone; (10) that in zoning a neighborhood school, distance from home to school is only one of the criteria which the Board of Education must consider when it ultimately establishes the zone; and (11) that other criteria are utilization of school space, convenience of transportation, racial integration, topographical barriers, and continuity of instruction. The pairing plan here, the Superintendent asserts, meets the test of all these criteria.

In dismissing the petition, Special Term held (43 Misc 2d 621) that a plan which is otherwise reasonable and lawful is not rendered invalid because it also attempts to correct racial imbalance in the schools; that although the most important factor in the determination of the Board of Education to pair these two schools was the reduction of racial imbalance, it was not the only factor; and that the inconvenience to petitioners' children is not of a measure sufficient to permit the court to say that the

determination of the board was arbitrary or capricious or contrary to law.

On this appeal petitioners contend that: (a) their children have a right to go to the school nearest their homes; they cannot be compelled to go past the school nearest to their homes to a more distant school for the purpose of achieving racial balance; (b) the pairing plan excludes children from their neighborhood schools and denies them admission to those schools on the basis of race; (c) the pairing plan establishes racial quotas; and (d) the Board of Education has no power to use the criterion of racial balance as the compelling or as the primary reason in the fixing of school attendance zones.

In my opinion, petitioners' contentions are without merit and the judgment dismissing the petition should be affirmed.

In *Brown* v. *Board of Educ.* (347 U. S. 483), the Supreme Court determined that racial *segregation* in the public schools violates the equal protection clause of the Fourteenth Amendment in that such segregation discriminates against Negro pupils. In effect, what petitioners contend in the case at bar is that racial *integration* also violates the equal protection clause of the Fourteenth Amendment because such integration discriminates against white pupils. No court has ever so held.

In *Bell* v. *School City of Gary, Indiana* (213 F. Supp. 819, affd. 324 F. 2d 209, cert. den. 377 U. S. 924), relied on by petitioners, Negro petitioners sought to compel the Board of Education there involved to take affirmative action to reduce or to eliminate *de facto* segregation in the public schools after the board had refused to act. The court held that the board had no affirmative constitutional duty to alter *de facto* racially segregated attendance districts. In the case at bar the Board of Education has acted; and white petitioners are now seeking to have that action set aside. Thus, the issue before the court is not whether the Board of Education must or is constitutionally required to act, but rather whether the Board of Education may be prohibited from acting.

The pairing (or Princeton) plan was upheld when applied to three elementary schools in Malverne, Long Island (*Matter of Vetere* v. *Mitchell*, 21 A D 2d 561). Other variations of the pairing plan have been upheld (*Matter of Strippoli* v. *Bickal*, 21 A D 2d 365; *Morean* v. *Board of Educ. of Montclair*, 42 N. J. 237; *Fuller* v. *Volk*, 230 F. Supp. 25).

In all these cases, as well as in *Matter of Balaban* v. *Rubin* (20 A D 2d 438, affd. 14 N Y 2d 193, *supra*), it was held that a Board of Education is not constitutionally prohibited from taking affirmative action to reduce or eliminate *de facto* segre-

gation in the public schools, or from taking race into consideration as one of the factors in the drawing or redrawing of school attendance lines in order to reduce the extreme concentration of Negro pupils in one of its public schools, where such concentration admittedly resulted, not from deliberate action of the State, but from *de facto* or adventitious segregation.

However, here, as already indicated, the criterion of racial balance was not the only one considered by the Board of Education in its adoption of the pairing plan. The following criteria were also considered: (1) The distance from home to school; (2) the closeness of the two schools (six short blocks apart), which rendered them adaptable for a common attendance zone; (3) the distances travelled and the conditions of travel, which did not constitute undue hardships or safety hazards for the children; (4) the absence of topographical barriers; (5) the utmost utilization of the school space by reason of the elimination of the prior 110% use of Public School 149; (6) the reduction in the size of classes; (7) the elimination of the stigma which attaches to children who attend a school whose enrollment is almost exclusively Negro; (8) the feeling of inferiority and the deterring effect upon learning attitudes generated by any sense of stigma; and (9) the superior educational opportunities made available to all the children by reason of the pooling of facilities and the consolidation of resources.

In view of all these criteria on which the pairing plan here was founded, it cannot be said that the board's action was in any way arbitrary or capricious or contrary to law. The fact that some of the children will not go to a school nearest their homes or that they will have to go to a more distant school does not make the plan illegal or arbitrary. As we said in *Matter of Balaban* v. *Rubin* (*supra*), children cannot be given their choice of schools; the choice must be left to the sound discretion of the board. All the children affected by the plan will attend the school nearest their homes which accommodates their particular grades. No child will be refused admission to any school in his attendance area which accommodates his particular grade. If it be argued that children are refused admission to a school because there is another school in their attendance area, although not accommodating their specific grades, then the sections of the Education Law relied on by petitioners become segregation statutes mandating continuation in our schools of racial imbalance, and making *de jure* that which up to now has been merely *de facto* (*Matter of Vetere* v. *Mitchell*, 21 A D 2d 561, *supra*).

It is not correct to say that any child is being excluded from either school on the basis of race. While it is true that a child may not be permitted to go to the school closest to his home solely because his particular grade is not being accommodated there, it is also true that this restriction would apply equally to *all* children in the attendance zone, regardless of race.

The argument that the pairing plan establishes racial quotas is completely without merit. There is no attempt to achieve or thereafter to maintain and preserve the same racial composition of two schools involved. Every child residing in the attendance area goes to the school nearest his home which accommodates his grade, without regard to race or color and without any limitation as to the percentage of pupils of his own or of any other race or color (*Matter of Balaban* v. *Rubin*, *supra*).

Petitioners' argument that the assignment of children to overcome racial imbalance is violative of section 401 of title IV of the Civil Rights Act of 1964 (U. S. Code, tit. 42, § 2000c) is also without merit. The intent of the statute is that no funds and no technical assistance will be given by the United States Commissioner of Education with respect to plans for the assignment of students to public schools in order to overcome racial imbalance. The statute may not be interpreted to mean that such assignment is illegal or that reasonable integration efforts are arbitrary or unlawful.

The issue here involved is whether a reasonable and bona fide effort at integration may be prohibited. In my opinion, it may not be.

The judgment should be affirmed, without costs.

UGHETTA, J. (concurring). I concur solely on the ground that, under the circumstances here, it was within the competence of the Board of Education to effectuate a plan whereby all children of a given grade attend one school. But in the proper exercise of such power no child may be discriminated against by being forced to attend a certain school because of his color, whether the discrimination be in the professed interests of integration or segregation. " Classifications based on race [or color] for purposes of transfers between public schools * * * violate the Equal Protection Clause of the Fourteenth Amendment " (*Goss* v. *Board of Educ.* 373 U. S. 683, 687).

CHRIST, J. (concurring). I agree generally with the opinion of the Presiding Justice on the ground that *in this instance* the board's pairing plan does not discriminate against any individual residing in the new school zones and does not bar him

from attending or compel him to attend either Public School 149 or Public School 92 by reason of his race or color. Every child within the prescribed zones, irrespective of his race or color, will be required to attend the school for his zone if the school includes his grade.

Such a plan, if fairly and properly administered, does not violate the Equal Protection Clause of the Federal Constitution. I must, however, emphasize and extend this caveat: that the plan may become constitutionally invalid if, in actual operation, children are barred from attending or are compelled to attend either Public School 149 or Public School 92 by reason of their color, race, religion or national origin. In dealing with the people, the Government and its political subdivisions are forbidden to make any distinction, give any preference or deference, prescribe any punishment, or levy any tax on the basis of color, race, creed or origin. The constitutional rights of one class of citizenry may not be sacrificed or suppressed in order to vindicate or render more secure the constitutional rights of another class. Thus far, the plan here, as conceived and as initially placed in operation, does not have such a deleterious effect.

Brennan and Hopkins, JJ., concur with Beldock, P. J.; Ughetta, J., concurs in opinion; Christ, J., concurs in opinion.

Judgment affirmed, without costs.