Chief Judge Conway.
The individual respondents in the first of these eases are three teachers, a school clerk and a principal in the New York City school system who refused, when questioned by petitioner-appellant, Superintendent of Schools of the City of New York, to identify other school personnel as past or present members of the Communist party. All admitted past, but denied present membership in the Communist party themselves. For their refusal to answer the questions the Superintendent suspended them from their employment and instituted disciplinary action designed to terminate their terms.
The individual respondent in the second of these cases is an associate professor at Hunter College whom the petitioner-appellant, Board of Higher Education of the City of New York, dismissed — among other reasons — for similar refusal to answer questions about the “ past or present membership by municipal college staff members in the Communist Party or other subversive organizations.”[1]
*134 In both cases appeals were taken to the Commissioner of Education of the State of New York from the determinations of the respective petitioners. The Commissioner ruled against the petitioners in both appeals. In the first case the Commissioner enjoined the board and Superintendent of Schools from directing the defendant employees of the board to identify other present employees thereof who had been or then were members of the Communist party, except the defendant Cohen, who, as a school principal, was directed to name any person in his particular school whom he knew or believed to be a member of the Communist party. In the second case, the Commissioner of Education annulled the dismissal of the defendant by the Board of Higher Education, requiring simply that Hughes be given an opportunity to answer questions with respect to statistics (as to members) involving Communist party membership of other faculty members.
In essence, the Commissioner determined that the refusal of the defendant employees to submit to the interrogation concerning Communist affiliation, past or present, of other teachers furnishes no basis for disciplinary action by the petitioners.
The petitioners — the two New York City Boards of Education and the Superintendent of Schools of the City of New York— thereupon instituted the present article 78 proceedings to review and annul the Commissioner’s determination. The court at Special Term confirmed the Commissioner’s decision and dismissed the petitions. Pointing out that the Commissioner’s determination is, by section 310 of the Education Law, final and conclusive in matters relating to education “ unless arbitrary ”, the court declared that the “view of the commissioner in the arguable field of judgment and opinion cannot be said, as a matter of law, to lack rational basis ’ ’ and that his determination is not ‘ ‘ illegal, arbitrary or capricious.” The Appellate Division affirmed unanimously.
On this appeal the petitioners argue that the Commissioner’s decision prevents enforcement of the Feinberg Law and represents an illegal attempt in the guise of an administrative determination to nullify and repeal that statute and that the Commissioner’s determination does not involve educational policy affecting the school system but, instead, is concerned solely with upholding the refusal of individuals who, for legally *135 invalid reasons, refuse to answer relevant questions during an inquiry into subversion mandated by the Legislature and that his action is, therefore, arbitrary and illegal.
The Commissioner, on the other hand, asserts that his determination is one of educational policy; that all he determined was that a Board of Education may not suspend or dismiss a teacher who is unwilling to accuse another teacher of being or having been a Communist; that such determination was made in the exercise of judgment and is neither arbitrary nor capricious ; and that his ruling does not repeal or prevent enforcement of the Feinberg Law.
The initial question to be answered is the scope of the court’s review.
The Commissioner of Education is a constitutionally created officer. Section 4 of article V of the Constitution provides that: ‘ ‘ The head of the department of education shall be The Regents of the University of the State of New York, who shall appoint and at pleasure remove a commissioner of education to be the chief administrative officer of the department.” Section 305 of the Education Law, in turn, declares that the Commissioner of Education “ is the chief executive officer of the state system of education and of the board of regents. ’ ’ Section 310 of the Education Law, which deals with appeals to the Commissioner, reads, in pertinent part:
“ Any person conceiving himself aggrieved may appeal or petition to the commissioner of education who is hereby authorized and required to examine and decide - the same; and the commissioner of education may also institute such proceedings as are authorized under this article and his decision in such appeals, petitions or proceedings shall be final and conclusive, and not subject to question or review in any place or court whatever. Such appeal or petition may be made in consequence of any action: [emphasis supplied]. [There follows in 6 subdivisions a listing of various officials and bodies whose action may be reviewed and then the statute continues with the omnibus 7th subdivision.]
‘ ‘ 7. By any other official act or decision of any officer, school authorities, or meetings concerning any other matter under this chapter, or any other act pertaining to common schools.”
This court has said that the object of section 310 of the Educa *136 tion Law “is to make all matters pertaining to the general school system of the state within the authority and control of the department of education and to remove the same so far as practicable and possible from controversies in the courts ” (Bullock v. Cooley, 225 N. Y. 566, 576-577; emphasis supplied). The comment has also been made that “ Such a policy assures determinations by a person conversant with school problems ” (Matter of Nestler v. Board of Examiners, 192 Misc. 663, 665).
If the words of section 310 were to be read literally there could be no court review whatever of the Commissioner’s decisions on appeal, for the statute states that his decision “ shall be final and conclusive, and not subject to question or review in any place or court whatever.” However, our court has determined that the Legislature did not intend that the words are to be so read. Thus, we have said that ‘ ‘ decisions by the Commissioner of Education are final unless purely arbitrary ”. (Matter of Ross v. Wilson, 308 N. Y. 605, 608, emphasis supplied; Matter of Levitch v. Board of Educ., 243 N. Y. 373, 375.) The term “arbitrary”, standing by itself, would be quite sufficient to make it plain that only a narrow review of the Commissioner’s decisions is available in the courts. In the above-cited cases we undertook to emphasize the point by employing the phrase ‘‘purely arbitrary ”. With this rule as our guide we turn to a consideration of the issues to be resolved.
In his decision the Commissioner stated, inter alia, that the problem ‘ ‘ affects the administration of our entire education system ”; that there “ is near unanimity on the part of teachers throughout the State that indiscriminate use of this type of interrogation immediately engenders an atmosphere of suspicion and uneasiness in the schools and colleges ’ ’; that “ [t]rust which is necessary to keep morale at a high level is undermined”; that it “is notorious that part of the Communist philosophy encompasses falsehood as a means to an end ”; that the “ allegation by a member or former member of this organization standing alone could well be untrustworthy, yet it levels a deadly suspicion which is most difficult to disprove ”; that the “ literature of Communists who have recanted specifically sets forth allegations that their ilk have deliberately named persons who have had no connection with the organization for party reasons ”; that “ [e]ven if a person so named *137 is exonerated by lack of proof or is able to develop sufficient proof to allay suspicion, he is marked for life ’ ’; that the “ instant a name is uttered the public becomes aware of it ”; that a ‘ ‘ school system which sets one teacher against another in this manner is not conducive toward the strength and cohesion which needs to exist in order to instill character into the student body”; that, as said in The New York Times in an editorial, a fundamental reason for forbidding the interrogation 1 ‘ is that it establishes as an official test of good faith a teacher’s willingness to act as an informer ” and that “ [m]any a man willing to make a clean breast of his own past finds it morally indefensible to tell on others who he has no reason to believe are engaged in any conspiracy now”; that the respondent boards insist 1 ‘ that unless they can require any employee to name any person whom he accuses of being a Communist they are ‘ thwarted at a vital stage ’ ”; that “ this is not so ”; that ‘ ‘ the board is most optimistic if it believes that a jury will convict on the flimsy evidence of informers ”; that the 1 ‘ argument that the board needs someone to name names is of no value here because the board in any event can call in any teacher or for that matter all teachers and ask if they are Communists ’ ’; that in ‘ ‘ case of denial the board is still up against the necessity of obtaining proof and the use of an informer is of little value ”; that “ in the overall administration of the public school system * * * the institution of the policy under consideration here would do more harm than good and that this type of inquisition has no place .in the school system ”; and that, therefore, “ the Board of Education may not properly utilize it.”
On oral argument, the petitioners-appellants conceded that the respondent employees had a right to appeal to the Commissioner, pursuant to section 310, from the action taken against them by petitioners-appellants, but contended that on such appeal the Commissioner’s sole function was to determine whether the questions put to the respondent employees were relevant to a legal inquiry. We find no authority to support that. On the contrary, our court has indicated—and the language of the statute itself suggests — that section 310 was intended to confer a wide sweep of power upon the Commissioner (see Bullock v. Cooley, 225 N. Y. 566, 576-577, supra).
*138 The Constitution has made the Commissioner of Education the administrative head of the State system of education and he has been given the final authority in passing on the numerous questions bound to arise in the administration of the school system. The question of whether the respondent employees could be suspended or discharged for failing to inform as to particular conduct of fellow teachers was one within his jurisdiction since it is obviously related to the administration of the school system. The petitioners-appellants had determined, in effect, that a teacher unwilling to answer their questions as to such conduct of fellow-teachers was unfit to continue to serve. The Commissioner was certainly empowered to rule that such a conclusion would be detrimental and injurious to the school system. As stated above, he has declared that the type of interrogation conducted by petitioners-appellants was bound to engender an atmosphere of suspicion and uneasiness in the schools and colleges; that it set one teacher against another and as such was not conducive to the strength and cohesion which must exist in order to instill character in the student body; and that a breakdown of moral fibre will result. Undoubtedly, one may differ with the Commissioner’s reasoning. One may, for example, assert with some force the view that a teacher, as a molder of thought and as a citizen of this State and Country, should not have the right to claim a privilege to impede the removal of persons disloyal to their country. But it is quite another matter to pronounce the Commissioner’s view in this arguable field of judgment, which is based on the considerations enumerated above, as lacking rational basis. Such a pronouncement, we believe, could only be the product of temerity—not that of calm judicial deliberation. In the exercise of judicial self-restraint this court must rule that the Commissioner’s conclusion that the desirable objective of ridding the school system of Communists would not be served by the method of inquiry pursued by the petitioners-appellants, and that such method of inquiry would do more harm than good (which conclusion, we are told, was arrived at only after consultation with numerous leaders in the field of education), is not the result of arbitrariness or capriciousness.
Petitioners-appellants contend that the Commissioner’s determination not to allow them to insist that respondent *139 employees “ name names” is inconsistent with his determination to permit petitioners-appellants to require Hughes to give them statistical information concerning the number of persons in the Communist unit of which he was a member; the average attendance at meetings of that unit; the number, if any, of the faculty members of Hunter College who were members of that unit and the number, if any, of that unit who are still on the Hunter faculty. A brief, but it seems to us, satisfactory answer to that argument was given by Special Term: “ The commissioner’s requirement that Hughes divulge certain statistical information not connected with the disclosure of the identity of any of his associates, which compulsive disclosure the commissioner there, as here, specifically forbade, indicates no inconsistency in his determinations.”
The Commissioner also took a different view of the obligation of respondent Cohen, the principal. As to him the Commissioner said: [1] ‘ He has subordinates under him for whom he is responsible. The principles heretofore enumerated are not applicable to him in so far as they relate to those teachers under his jurisdiction in his school. A board would be clearly justified in expecting him, even without a request, to report to it the name of any person in his school whom he knows or believes to be a Communist or otherwise unfit to be an employee of his school. As a matter of fact, the Rules of the Board of Regents (§ 244) promulgated pursuant to Section 3022 of the Education Law (Feinberg Law) require him to do so if the board wishes to assign him that duty. The Board needs no rule or regulation in this respect and his refusal to answer subjects him to discipline for such reason.”
This we consider to be but further evidence of the fact that the Commissioner’s decision was a reasoned one rather than the product of arbitrariness or capriciousness.
Petitioners-appellants ’ major argument is that the Commissioner’s determination prevents enforcement of the Feinberg Law and represents an attempt to nullify and repeal that statute.
Under the provisions of the Feinberg Law (Education Law, § 3022) the Legislature directed the Board of Regents to adopt rules and regulations for the enforcement of all laws prohibiting subversives from obtaining or retaining employment *140 in the public school system. The Legislature also directed local Boards of Education to enforce those laws in a vigorous manner. However, the Legislature has not directed the boards to employ any particular method in ridding the schools of subversives. The petitioners-appellants take the position that the only means available to them to accomplish the object of the Feinberg Law is the one they sought to employ here. In this we think they are in error. It may well be that it is the easiest and the most efficient means. But it can hardly be said to be the only reasonable means at hand. If the enforcement of our laws were to depend upon informers alone, as the board appears to contend is the fact as to the Feinberg Law, we would live in a chaotic state. Those charged with the duty of enforcement know this and, so, resort to other traditional methods for obtaining the desired information. The board must do likewise. For example, the board is free to question as many of its employees as it wishes concerning their own memberships in the Communist party. And, we suppose the board could use investigators to examine into the background and associations of its employees. It is also noteworthy that no other school board, of the several hundred existing in the State of New York, has found it necessary to conduct the type of investigation or interrogation to which the defendant employees have been subjected. No other school board has found it necessary to seek to compel teachers to inform on their fellow faculty members under pain of discipline. The petitioners-appellants can hardly argue that no other Board of Education in the State is making a sincere effort to enforce the law.
The argument has been made that the failure of the Legislature to enumerate in the Feinberg Law the methods to be employed in ferreting out subversives in the educational system compels the conclusion that the usual means of inquiry are authorized; that the petitioners-appellants are free, therefore, to utilize any of those means without interference by the Commissioner of Education; that the Legislature has not empowered the Commissioner to limit the methods of inquiry; and that the power to determine whether a particular type of questioning will do more harm than good is not within the scope of the Commissioner’s power since this power has not been conferred on him by any statute and has not been granted to him by the *141 Constitution of our State. This reasoning, we think, will not withstand analysis.
As stated earlier, the Commissioner of Education has been made the chief administrative officer of the educational system of the State and, as such, has been invested with broad powers of review. He may review any “ official act or decision of any officer, school authorities, or meetings concerning any * * * matter under this chapter, or any * * * • act pertaining to common schools.” (Education Law, § 310, subd. 7.) The courts, in turn, may review the Commissioner’s determinations made on appeals taken to him pursuant to section 310. However, the Commissioner’s determinations may not be stricken down unless they be ‘1 purely arbitrary. ’ ’ The Commissioner on his review has not been so restricted. That is, unlike the courts, the Commissioner is empowered to substitute his judgment for that of the officer whose action he is reviewing. This is the plain import of section 310. All the courts may do is ascertain whether the Commissioner’s decision was purely arbitrary. To illustrate the significance of this in the present case: Several reasonable investigatory methods were available to the petitioners-appellants. They chose one. The Commissioner was free to overrule the use of the selected method without having to find that it was totally unreasonable ; he was at liberty to require the petitioners-appellants to resort to one of the other methods of investigation which he had reason to believe would be less injurious to the educational system. The courts, on the other hand, are not empowered to so substitute their judgment for that of the Commissioner and if Ms decision be not purely arbitrary it may not be overturned.
The question to be answered is not whether the Feinberg Law authorized the Commissioner to limit the methods of inquiry. At the time of the enactment of the Feinberg Law the Commissioner possessed the sweeping power to review action taken by educational officers, which has been described above. The question is whether the Feinberg Law withdrew from the Commissioner any of the power with which he had theretofore been invested. Certainly, the Feinberg Law does not expressly interfere with such power and it is familiar learning that repeals by implication are not favored by the courts. Generally speaking, a statute is not deemed to repeal *142 an earlier one without express words of repeal, unless the two are in such conflict that both cannot be given effect. If by any fair construction a reasonable field of operation can be found for two statutes, that construction should be adopted (see McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 391, and the numerous cases cited therein). We have already pointed out that the petitioners-appellants can discharge their duty under the Feinberg Law notwithstanding the decision of the Commissioner here under consideration. Accordingly, there is no basis for a holding that the Feinberg Law was intended to take from the Commissioner any part of the power previously granted him by the Education Law.
We would stress the fact that we are not passing upon the correctness of the determination of the Commissioner nor are we holding that members of the teaching profession in this State are exempt from citizenship responsibilities imposed not only on all other public servants, but on individuals in private life as well. We are merely discharging our judicial function of interpreting the legislative will. The lawmakers have the right and power to prescribe the Commissioner’s powers and to circumscribe our scope of review of his determinations.
The orders appealed from should be affirmed, with costs.

. Hughes was also dismissed for membership in the Communist party. He petitioned for a hearing on that issue pursuant to section 12-a of the Civil Service Law. Special Term dismissed his petition, but the Appellate Division reversed (Matter of Hughes v. Board of Higher Educ., 286 App. Div. 180) and we affirmed the Appellate Division (309 N. Y. 319), thus holding that Hughes was entitled to a trial in open court pursuant to section 12-a of the Civil Service Law on the question whether he had in fact and in good faith severed his relation or whether he had retained membership in the Communist party after its listing as subversive by the Board of Regents pursuant to the Feinberg Law (Education Law, § 3022). After the ensuing trial in open court judgment was entered in Hughes’ favor.