**Wayne OLSON, a minor, by Arthur Olson, his parent and next friend, Plaintiff,**

**v.**

**The BOARD OF EDUCATION OF UNION FREE SCHOOL DISTRICT NO. 12, MALVERNE, NEW YORK, Luis Bejarno, President, Board of Education of Union Free School District No. 12, Malverne, New York, Luis Bejarno, Fred Hook, Thomas Hanrahan, Paul A. Stone and William H. Moody, Members of the Board of Education of Union Free School District No. 12, Malverne, New York, and James E. Allen, Jr., Commissioner of Education of the State of New York, Defendants.**

No. 65-C-1170.

United States District Court
E. D. New York.

Feb. 11, 1966.

Caylor, Hampton & Neimeth, Lynbrook, N. Y., for plaintiff, Mason L. Hampton, Jr., Lynbrook, N. Y., of counsel.

Joseph E. McMahon, New York City, for defendants, members of Bd. of Education, individually, and Bd. of Education.

John P. Jehu, Albany, N. Y., for defendant, James E. Allen, Jr., Comr. of Education of State of New York.

BARTELS, District Judge.

Union Free School District No. 12 lies partially in the Village of Malverne, Lynbrook, Rockville Centre, West Hempstead and the Town of Hempstead and is known as the Malverne School District, which operates a school system containing three neighborhood elementary schools, maintaining classes from kindergarten through the fifth grade, as follows: (1) Woodfield Road School [Woodfield School]; (2) Lindner Place School [Lindner School]; and (3) Davison Avenue School [Davison School]. As a result of the residential pattern of the community, 91% of the students of the Woodfield School, 21% of the students of the Lindner School, and 18% of the students of the Davison School, are Negroes. On a district wide basis, the percentage of Negroes in the elementary grades is between 42% and 51%.

In November of 1962, the parents of certain Negro children appealed to the Commissioner of Education (one of the defendants herein) under the New York State Education Law, McKinney's Consol. Laws, c. 16, § 310, seeking an order reversing the action of the Board of Education of District 12 [Board] which had declined to transfer their children from the Woodfield School to the other two schools having a lower percentage of Negro students, claiming that the refusal to do so deprived their children of equal educational opportunities because of the racial imbalance of the schools in the district. The Commissioner referred the matter to a three-man committee (two of whom were members of the N.A.A. C.P.) to visit the district, study the problems involved and make recommendations, which was done. Thereafter oral arguments were held and the Commissioner on June 17, 1963, made his determination in the appeal, accepting one of the Committee's proposals, which in effect ordered the Board to abandon the three neighborhood elementary attendance zones and to replace them by (a) substituting two attendance zones for grades kindergarten through 3, (K–3) by dividing the district into two approximately equal zones for attendance of all K–3 pupils in either one or the other of the remaining two schools, depending on relative proximity of the student to either one or the other of these two schools; and (b) substituting a single attendance zone for grades 4 and 5, consisting of the entire district—so that all students of grades 4 and 5 (as all students of grades 6–12 already were doing) would attend in one place, i. e., the Woodfield School (which then had had the 74% Negro attendance).[1]

The Commissioner's three-man committee found, among other things, that "If racial difference were not a fact of life in this community, the attendance areas as defined could be cited as an excellent example of administrative planning" and also that "Your Committee believes that in the entire complaint there is one basic and real issue. Is the Woodfield Road School a racially imbalanced

---

1. None of the elementary students live two miles or more from any of the three schools, so that no transportation by bus was mandated by the decision. See, New York State Education Law, § 3635.

school? If it is, then it follows that the social psychological and educational problems which are ordinarily found in segregated or racially imbalanced schools are present in this situation. Your Committee has found that the Woodfield Road School is in fact a racially imbalanced school". In his order the Commissioner found, among other things, that racial imbalance existed in the Woodfield School but that the educational standards at that school were not below those of the other two elementary schools and that the Board had not been arbitrary in establishing or refusing to change school attendance lines.[2]

Proceedings were then instituted in the Supreme Court of the State of New York, Albany County, under Article 78 of the Civil Practice Law and Rules [C.P.L.R.], seeking to annul the Commissioner's decisions, entitled: Vetere v. Allen and Hummel v. Allen. Upon appeal from the judgment of the Special Term annulling, in part, the Commissioner's determination,[3] the Appellate Division reversed this decision[4] and the Court of Appeals affirmed the determination of the Appellate Division with a *per curiam* opinion, to which there were two dissents.[5] Thereafter, on October 11, 1965, the United States Supreme Court denied a writ of certiorari.[6]

Against this background, it is evident that all State administrative and judicial remedies have been exhausted.[7]

In this particular case a parent of another student attending the fifth grade of the Lindner School, institutes this action pursuant to Rule 17(c), Fed.Rules Civ.Proc., 28 U.S.C.A., and under 42 U.S. C.A. §§ 1981, 1983, and 28 U.S.C.A. § 1343(3), upon the ground that the action of the Commissioner violates the plaintiff's rights under the Fourteenth Amendment and the Civil Rights Act of 1964 (42 U.S.C.A. § 2000c et seq.), seeking both a preliminary and a permanent injunction to restrain the defendants from enforcing the directive of the Commissioner to reorganize the attendance areas of Union Free School District No. 12, Malverne, New York, as above proposed. Plaintiff moves for a preliminary injunction under Rule 65(b), Fed.Rules Civ.Proc., 28 U.S.C.A., and the defendants cross-move to dismiss the complaint under Rule 12(b) (6), Fed.Rules Civ. Proc., 28 U.S.C.A., or in the alternative, for a summary judgment under Rule 56, Fed.Rules Civ.Proc., 28 U.S.C.A.

I

Because the defendants' main arguments are predicated upon lack of jurisdiction, failure to state a claim for relief,

2. In a statement dated June 14, 1963 to the local school administrators and presidents of the Boards of Education on the subject of racial imbalance in schools, the Commissioner referring to a statement of the Board of Regents of the State Education Department, made the following observations:

"The Regents' statement goes on to point out that modern psychological and sociological knowledge seems to indicate that in schools in which the enrollment is largely from a minority group of homogeneous, ethnic origin, the personality of these minority group children may be damaged. There is a decrease in motivation and thus an impairment of ability to learn. Public education in such a situation is socially unrealistic, blocking the attainment of the goals of democratic education, and wasteful of manpower and talent, whether the situation occurs by law or by fact.
\* \* \* \* \* \*

"The position of the Department, based on the policy of the Regents, and the principles of the Commissioner's Advisory Committee, is that the racial imbalance existing in a school in which the enrollment is wholly or predominantly Negro interferes with the achievement of equality of educational opportunity and must therefore be eliminated from the schools of New York State."

3. Vetere v. Allen, Sup.Ct., Albany County, 1963, 41 Misc.2d 200, 245 N.Y.S.2d 682.

4. Vetere v. Allen, App.Div.3rd Dep't 1964, 21 A.D.2d 561, 251 N.Y.S.2d 480.

5. Vetere v. Allen, 1965, 15 N.Y.2d 259, 258 N.Y.S.2d 77, 206 N.E.2d 174.

6. Allen v. Hummel, 382 U.S. 825, 86 S.Ct. 60, 15 L.Ed.2d 71.

7. Cf., Fuller v. Volk, 3 Cir. 1965, 351 F. 2d 323, vacating Fuller v. Volk, D.C.N.J. 1964, 230 F.Supp. 25.

and *res judicata*, it is appropriate to consider these contentions at the outset. It is claimed that the complaint does not set forth facts showing (i) any deprivation under color of State law or regulation of any right, privilege or immunity as required by 28 U.S.C.A. § 1343 and 42 U.S.C.A. §§ 1981, 1983, or (ii) irreparable injury, and that the Civil Rights Act of 1964, 42 U.S.C.A. § 2000c et seq., does not, as claimed by plaintiff, invalidate the Commissioner's plan. Defendants further contend that the issue has been foreclosed by the denial of certiorari by the United States Supreme Court in *Allen v. Hummel* and consequently no substantial Federal question is involved. Moreover, they also assert that the same denial is an indication that the Supreme Court approved the judgment of the New York Court of Appeals and hence the plaintiff is collaterally estopped from raising the same issues in this proceeding.

■ Under 42 U.S.C.A. §§ 1981, 1983, and 28 U.S.C.A. § 1343, this Court is expressly vested with jurisdiction to protect against any infringement of the Federal civil rights by any State law or regulation and this jurisdiction is not defeated by the possibility that the complaint might fail to state a cause of action. That question must be decided after, and not before, the Court assumes jurisdiction. Bell v. Hood, 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939.

■ The troublesome question here is whether the decision of the New York Court of Appeals in *Vetere* is *res judicata*. Both the constitutional requirement of full faith and credit and the doctrine of *res judicata* would bar a subsequent suit in a Federal court instituted by members of a class whose claims both State and Federal, were fully adjudicated in a prior State court action.[8] Upon analysis the Court is of the opinion that the instant case does not fall within the proscription of these principles.

■ First, the *Vetere* suit and the present action are not between the same parties. The suit brought by the plaintiffs in *Vetere* did not purport to be a class action under Section 195 of the New York Civil Practice Act (now C.P.L.R. § 1005) and accordingly would not be so considered by the New York courts[9]; it is now too late for *Vetere* to be converted into a class action, which would be *res judicata* against the plaintiffs in this action.[10] This is not a case where an action was brought by "members of a class whose interests are 'indistinguishable' from those of persons involved in a prior suit" since the "circumstances differ"[11]; nor has there been any proof that the plaintiffs were in privity or associated with the petitioners in *Vetere*. Although a prior decision of the Court of Appeals *on the same issues* would have great weight under the doctrine of *stare decisis*, it could not be

---

**8.** State court judgments are entitled to the same *res judicata* effect in Federal courts as in State courts, Oklahoma Packing Co. v. Oklahoma Gas & Electric Co., 1940, 309 U.S. 4, 60 S.Ct. 215, 84 L.Ed. 447; St. John v. Wisconsin Employment Relations Board, 1951, 340 U.S. 411, 71 S.Ct. 375, 95 L.Ed. 386, and this principle is applicable to decisions involving Federal constitutional questions as well as issues of State law. Gart v. Cole, S.D.N.Y.1958, 166 F.Supp. 129, aff'd, 2 Cir. 1959, 263 F.2d 244, cert. denied, 359 U.S. 978, 79 S.Ct. 898, 3 L.Ed.2d 929; Camacho v. Rogers, S.D.N.Y.1961 (three-judge court), 199 F.Supp. 155; Chirillo v. Lehman, S.D.N.Y.1940 (three-judge court), 38 F.Supp. 65, aff'd, 1941, 312 U.S. 662, 61 S.Ct. 741, 85 L.Ed. 1108.

The *habeas corpus res judicata* exception has not been extended to suits under the Civil Rights Acts. Compare Fay v. Noia, 1963, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, with Rhodes v. Meyer, 8 Cir. 1964, 334 F.2d 709, cert. denied, 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186.

**9.** Brenner v. Title Guarantee and Trust Co., 1938, 276 N.Y. 230, 11 N.E.2d 890; Grofsick v. DeAngelis, Sup.Ct., Kings County, 1956, 156 N.Y.S.2d 878.

**10.** Cf., Realty Equities Corp. of New York v. Gerosa, Sup.Ct., New York County, 1960, 30 Misc.2d 481, 209 N.Y.S.2d 446.

**11.** Steinberg v. Donovan, Sup.Ct., Queens County, 1965, 45 Misc.2d 432, 433, 257 N.Y.S.2d 306, 307.

described as a bar to a subsequent action in either the State or the Federal courts.[12]

Second, despite the assertion by the petitioners and the mention by the dissenting judges in *Vetere* of the constitutional issue [13], the fact remains that the majority opinion neither discussed nor purported to decide this issue but, instead, determined that the powers of the Commissioner were all but absolute, that his administrative action under the New York State Education Law was not arbitrary or illegal and that any disagreement with his conduct could "only be heard in the Legislature".[14] In view of these grounds, it can reasonably be said that the court in *Vetere* had not "directly reached the federal constitutional question of an alleged denial of petitioner's rights under the Equal Protection Clause

of the Fourteenth Amendment" and accordingly that decision has "no relation to our decision here".[15]

Since the parties are not the same as in *Vetere* and since there is uncertainty as to whether the Court of Appeals reached the constitutional question, the bar of *res judicata* is here surrounded by a substantial doubt.[16] It is pertinent to add in this connection that the plaintiff here also seeks relief under the Civil Rights Act of 1964, 42 U.S.C.A. § 2000c et seq., which had not been enacted [17] at the time of the trial court's decision in *Vetere*. The Court must, therefore, face the responsibility of considering the substantive merits of the present controversy.[18]

█ This conclusion is not altered by the Supreme Court's denial of certiorari in *Vetere* inasmuch as that court has

12. Foy v. Schechter, 1956, 1 N.Y.2d 604, 154 N.Y.S.2d 927, 136 N.E.2d 883. But see Cuccia v. Bragdon, Sup.Ct., New York County, 1958, 14 Misc.2d 177, 178 N.Y. S.2d 985, aff'd, App.Div. 1st Dep't 1958, 6 A.D.2d 1034, 179 N.Y.S.2d 842; Roche v. Wagner, Sup.Ct., New York County, 1962, 34 Misc.2d 920, 229 N.Y.S.2d 594, aff'd, App.Div. 1st Dep't, 18 A.D.2d 647, 235 N.Y.S.2d 325, aff'd, 12 N.Y.2d 314, 239 N.Y.S.2d 537, 189 N.E.2d 805; Israel v. Wood Dolson Co., 1956, 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97, and other New York cases which seem to expand traditional concepts of *res judicata* and collateral estoppel.

13. In abstention cases, a litigant is entitled to a federal court adjudication of his federal constitutional rights if he has not clearly submitted these issues to the State courts for decision. England v. Louisiana State Board of Medical Examiners, 1964, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440. A litigant has been allowed to return to the federal court even though he sought unsuccessfully to have the State court decision reviewed by the Supreme Court on certiorari. Tribune Review Publishing Co. v. Thomas, D.C. Pa.1957, 153 F.Supp. 486, aff'd, 3 Cir., 254 F.2d 883. Assuming the application of this principle to this case, there is a question as to whether the petitioners in *Vetere* clearly intended to submit their federal constitutional claims to a State tribunal.

14. Vetere v. Allen, 1965, 15 N.Y.2d 259, 267, 258 N.Y.S.2d 77, 80, 206 N.E.2d 174,

176, cert. denied, 382 U.S. 825, 86 S.Ct. 60.

15. Silver v. Jordan, S.D.Calif.1964 (three-judge court), 241 F.Supp. 576, 579, aff'd, 1965, 381 U.S. 415, 85 S.Ct. 1572, 14 L. Ed.2d 689; See, also, Lisco v. McNichols, D.C.Colo., 1962 (three-judge court), 208 F.Supp. 471, aff'd, 1964, sub. nom. Lucas v. Forty-Fourth General Assembly of Colo., 377 U.S. 713, 84 S.Ct. 1459, 12 L. Ed.2d 632; Bell v. School Board of Powhattan County, Va., 4 Cir. 1963, 321 F.2d 494. But see, Lehigh Valley R. Co. of New Jersey v. Martin, 3 Cir. 1938, 100 F.2d 139, cert. denied, 1939, 306 U.S. 651, 59 S.Ct. 592, 83 L.Ed. 1049, and American Surety Co. v. Baldwin, 1932, 287 U. S. 156, 53 S.Ct. 98, 77 L.Ed. 231, where *res judicata* was applied to constitutional issues which could have been raised.

16. But see, Morton Salt Co. v. City of South Hutchinson, 10 Cir. 1947, 159 F. 2d 897; Restatement, Judgments, § 93 (1942).

17. Cf., Gart v. Cole, supra.

18. Compare White v. Howard, 1954, 347 U.S. 910, 74 S.Ct. 476, 98 L.Ed. 1067, rehearing denied, 347 U.S. 931, 74 S.Ct. 529, 98 L.Ed. 1083, in which the Supreme Court cryptically vacated a judgment based "upon considerations of public policy to which the doctrine of res judicata should yield." Howard v. Ladner, S.D. Miss.1953 (three-judge court), 116 F. Supp. 783, 793.

often warned the Bench and the Bar that such action cannot be considered as an expression of opinion upon the merits of any of the issues involved.[19]

## II

 Plaintiff's assertion that Section 401(b) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000c(b), constitutes a prohibition against any plan to correct racial imbalance is without merit. The definition of the word "desegregation" in that section relates to the administration of the government aid program in the desegregation of public schools. It has no relevance to the legality or the constitutionality of such a plan.[20]

Plaintiff's real grievance is that he is deprived of both the equal protection of the law and due process in violation of the Fourteenth Amendment by the Commissioner's directive because it excludes him from his neighborhood school and compels him to attend a more distant, non-neighborhood school solely because of his race. He attacks the reason for the directive as being grounded upon the Commissioner's report of June 14, 1963, which, among other things, proclaimed "at this time and *for the purpose of this report*, a racially imbalanced school is defined as one having 50 per cent or more Negro pupils enrolled." (emphasis in original) and asserts that the Commissioner's conclusion that such imbalance, *ipso facto*, produces inherently inferior educational opportunities is based upon race alone and without any factual basis and hence is arbitrary. If this is true, then the Commissioner's action is discriminatory and in violation of both Section 3201 of the New York State Education Law and the Fourteenth Amendment.

The issue then is whether racial imbalance in public schools, *per se,* under certain circumstances creates unequal educational opportunities for minority groups and if so, may it be corrected without infringing the constitutional rights of others. This is not necessarily the same question as the effect of defacto segregation upon such opportunities inasmuch as the latter depends upon a greater percentage of racial imbalance.

In Brown v. Board of Education of Topeka, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, the Court struck down schools which were compulsorily segregated by law, holding that the separation of children in schools "solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." (p. 494, 74 S.Ct. p. 691) It did not decide that the same emotional and mental condition also resulted when the segregation was not compulsory but arose from the residential pattern of the neighborhood, nor did it decide that there must be coerced integration of the races in order to accomplish educational equality for this also would require an appraisal of the effect upon the hearts and minds of those who were so coerced.

 We begin with the postulates that there is no constitutional mandate to mix the races in order to remedy racial imbalance for educational purposes,[21] nor any such mandate precluding such mixing or in effect requiring school authorities to maintain neighborhood schools.[22]

19. Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 1915, 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629; State of Maryland v. Baltimore Radio Show, 1950, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562.

20. See, Addabbo v. Donovan, App.Div. 2d Dep't, 1965, 22 A.D.2d 383, 256 N.Y.S. 2d 178, aff'd, 16 N.Y.2d 619, 261 N.Y.S. 2d 68, 209 N.E.2d 112, cert. denied, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158.

21. Bell v. School City of Gary, Indiana, 7 Cir. 1963, 324 F.2d 209, cert. denied, 1964, 377 U.S. 924, 84 S.Ct. 1223, 12 L. Ed.2d 216; Downs v. Board of Education of Kansas City, Kansas, 10 Cir. 1964, 336 F.2d 988, cert. denied, 1965, 380 U. S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800.

22. See, Springfield School Committee v. Barksdale, 1 Cir. 1965, 348 F.2d 261; Dowell v. School Board of Oklahoma, W. D.Okla.1965, 244 F.Supp. 971; Fuller v. Volk, D.C.N.J.1964, 230 F.Supp. 25, va-

In attempting to formulate a plan which will provide equal educational opportunities to a minority group, it is elementary that the plan should not at the same time deprive the majority group of its constitutional rights. "The constitutional rights of one class of citizenry may not be sacrificed or suppressed in order to vindicate or render more secure the constitutional rights of another class." [23] This principle was clarified in Springfield School Committee v. Barksdale, 1 Cir. 1965, 348 F.2d 261, where the court said: " * * * when the goal is to equalize educational opportunity for all students, it would be no better to consider the Negro's special interests exclusively than it would be to disregard them completely." (p. 264)

In redrawing attendance zones for school districts, a number of factors come into play affecting all students, both white and Negro, which must be weighed if the action of the school authorities is not to be classified as arbitrary. "The neighborhood plan is not simply a matter of administrative convenience and cost. In the elementary schools there are problems of transportation which may seem important to individual families, and there is, of course, beyond that the much mooted issue of large scale 'bussing.' Pedestrian crossing of traffic arteries is dangerous for the lower ages. Other values may exist, both for the children and the parents, in having the school close to the home. Correspondingly, the very correction of racial imbalance may have adverse effects upon the educational environment." [24] The same thought was emphasized in Booker v. Board of Education, Plainfield, supra, where the Court said: "Considerations of safety, convenience, time economy and the other acknowledged virtues of the neighborhood policy must be borne in mind. Costs and other practicalities must be considered and satisfied. And trends towards withdrawal from the school community by members of the majority must be viewed and combatted, for if they are not, the results may be as frustrating as the inaction complained about by the minority." (212 A.2d p. 11)

In pursuing the objective of equal educational opportunities, there must be some correlation between the objective and the means of accomplishing the same, which in this case is the correction of racial imbalance; otherwise the plan itself may frustrate its very purpose. "In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." [25]

Here the charge is that the Commissioner's directive is based solely upon race and has no connection with equal educational opportunities and consequently it is not correlated with his objective. If race has no relevance to education and it is the only support for the Commissioner's action, it must be condemned. [26] In reaching its decision the Court will limit its consideration, however, to the facts in this particular case, leaving to another day the broader issue as to whether or not 50% of racial imbalance in any school automatically

---

cated on other grounds, 3 Cir. 1965, 351 F.2d 323; Offermann et al. v. Nitkowski et al., W.D.N.Y., 1965, 248 F.Supp. 129; Morean v. Board of Education of Montclair, S.C. of N.J.1964, 42 N.J. 237, 200 A.2d 97; Booker v. Board of Education, Plainfield, S.C. of N.J.1965, 45 N.J. 161, 212 A.2d 1.

23. Addabbo v. Donovan, supra, 22 A.D. 2d p. 390, 256 N.Y.S.2d p. 185 (concurring opinion).

24. Springfield School Committee v. Barksdale, supra, 348 F.2d p. 264.

25. Shelton v. Tucker, 1960, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231.

26. Goss v. Board of Education of the City of Knoxville, Tennessee, 1963, 373 U.S. 683, 687, 83 S.Ct. 1405, 1408, 10 L.Ed. 2d 632.

creates educational inequalities.[27] "Broader issues have been urged for our consideration, but we adhere to the principle of deciding constitutional questions only in the context of the particular case before the Court. We have frequently reiterated that this Court will decide constitutional questions only when necessary to the disposition of the case at hand, and that such decisions will be drawn as narrowly as possible." [28]

It happens to be a fact in the instant case that the educational facilities, instructions and achievement quotas in both the Woodfield and the Lindner Schools are in all respects equal. What then is the basis for the reorganization? On June 14, 1963, the date of the Commissioner's 50% directive, the Woodfield School had 75% Negro students. The Commissioner had prior thereto appointed the committee above described, which studied the conditions in both schools and rendered certain findings and opinions.

Based upon those findings and opinions, the Commissioner on June 17, 1963, issued his own opinion [29] concluding that racial imbalance in the Woodfield School "constitutes a deprivation of equality of educational opportunity envisioned under the Education Law of New York State for the pupils compelled to attend that school". He predicated his conclusion chiefly upon "modern psychological and sociological knowledge" as mentioned in the Regents' Statement and he relied upon the comments of the advisory committee [30] in adopting the committee's proposal No. 1. It thus appears that the Commissioner's determination is based solely upon such "modern psychological and sociological knowledge" without specifying how such knowledge was obtained. Other experts in the field of public education are also of the same opinion that racial imbalance in schools constitutes a denial to Negro children of equal educational opportunities and at the same time is harmful to all children, both white and non-white,[31] although there are opinions which question and differ with this postulate.[32] In fact, the Com-

27. This is a rigid and sweeping rule based upon a purely quantitative analysis without a consideration of the facts pertaining to each individual case.

28. Sweatt v. Painter, 1950, 339 U.S. 629, 631, 70 S.Ct. 848, 849, 94 L.Ed. 1114.

29. In the Matter of the Appeal of Patricia Ann Mitchell, et al. against the Board of Education of Union Free School District No. 12 of the Town of Hempstead, Nassau County.

30. Some excerpts are as follows:
"In contemporary America, race or color is unfortunately associated with status distinctions among groups of human beings. The public schools reflect this larger social fact in that the proportion of Negroes and whites in a given school is often associated with the status of the school. The educational quality and performance to be expected from that school are frequently expressed in terms of the racial complexion and general status assigned to the school. It is well recognized that in most cases a school enrolling a large proportion of Negro students is viewed as a lower status school. It is also true, of course, that an all white school enrolling a substantial proportion of children from culturally deprived homes is frequently considered less desirable.
"A cardinal principle, therefore, in the effective desegregation of a public school system is that all of the schools which comprises that system should have an equitable distribution of the various ethnic and cultural groups in the municipality or the school district. Where serious imbalance exists the school with the highest proportion of minority group and lower-status children tends to receive more such children as parents who are able to do so move to neighborhoods and schools of high status."

31. See, e. g., Report of the Advisory Committee on Racial Imbalance and Education, Massachusetts State Board of Education, April, 1965, and authorities cited in Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564, 568, n. 2 (January, 1965).

32. See, e. g., Conant, James Bryant, Slums and Suburbs (1961), pp. 27–29; Julia Vane (Hofstra University), Relation of Early School Achievement to High School Achievement When Race, Intelligence and Socioeconomic Factors are Equated, and

missioner himself in 1956 was of the opinion that it was unnecessary to correct an imbalance of 80% Negro children in order to provide equal educational opportunities.[33]

What amount of and when racial imbalance causes the alleged inadequacies in educational opportunities may defy objective measurement,[34] but common sense indicates that performances in the comparative schools cannot be completely ignored in reaching any such evaluation. It is the Commissioner's position that this factor has been weighed in the reorganization of attendance zones. Under the vast grant of power bestowed upon the Commissioner of Education by the Legislature, the authority of the New York courts to review his ruling is limited to whether the same is arbitrary, capricious, or unreasonable and does not extend to an examination of whether or not the ruling was supported by substantial evidence. That the record is barren of anything but opinion evidence is apparently immaterial. This illustrates the extent of the Commissioner's power which has raised many questions and caused many problems including the present one.[35]

The point to be recognized in a case where all other educational factors are equal, is that the Commissioner's action is based solely on expert opinion. This does not mean that his action is necessarily arbitrary or capricious since an administrative decision may rest upon expert opinion alone.[36] This was the conclusion reached in *Vetere* [37] where the Court stated: "Disagreement with the sociological, psychological and educational *assumptions* relied on by the Commissioner cannot be evaluated by this court." [38] (Emphasis supplied) While

---

also, Oscar Handlin, Fire-Bell in the Night (1964).

33. Matter of the Appeal of Bell, 77 State Dep't Reports 37 (1956). In the same case Commissioner Allen made the following statement: "Because of the incidence of location, the mere fact that the preponderance of the children who would normally attend the neighborhood school happened to be white or Negro, of Polish, Irish, Scotch, Swedish, Italian or English descent or otherwise or who espouse one religion or another, does not require a board to attempt to gerrymander the lines, to assign but a certain percentage to a particular school. *This would constitute as much discrimination as a gerrymandered line to accomplish the opposite effect.*" (Emphasis supplied)

34. For a discussion of some proposed formulas, see Booker v. Board of Education, Plainfield, S.C. of N.J.1965, 45 N.J. 161, 212 A.2d 1, 9–10. See, also, Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, supra, p. 579, n. 15.

35. No provision exists in the New York statute requiring the Commissioner to hold a quasi-judicial hearing or to receive evidence. Applied to cases like the instant one, such omission raises a serious question of due process. But see, contra, Application of O'Brien, App.Div. 3rd Dep't 1957, 3 A.D.2d 321, 160 N.Y.S.2d 754, appeal dismissed, 1958, O'Brien v.

Commissioner of Ed. of State of N. Y., 4 N.Y.2d 140, 173 N.Y.S.2d 265, 149 N.E.2d 705 (cf., concurring opinion of Judge Van Voorhis), cert. denied, 1959, 361 U. S. 117, 80 S.Ct. 207, 4 L.Ed.2d 154. Added to this power, Section 310 of the New York State Education Law expressly permits no review of the Commissioner's action. To this provision the courts were compelled to engraft an exception based on "pure arbitrariness". See, Board of Education of City of New York v. Allen, 1959, 6 N.Y.2d 127, 188 N.Y.S.2d 515, 160 N.E.2d 60.

36. Board of Education of City of New York v. Allen, supra; Justin Haynes & Co. v. Federal Trade Commission, 2 Cir. 1939, 105 F.2d 988, cert. denied, 308 U.S. 616, 60 S.Ct. 261, 84 L.Ed. 515; Neff v. Federal Trade Commission, 4 Cir. 1941, 117 F.2d 495.

37. Two dissenting judges, however, indicated that the Commissioner's action was both arbitrary and unconstitutional.

38. Vetere v. Allen, supra, 15 N.Y.2d p. 267, 258 N.Y.S.2d p. 80, 206 N.E.2d p. 176. See, Professor Edmond Cahn, Jurisprudence, 30 N.Y.U.L.Rev. 150, 157 (January, 1955), questioning the Commissioner's right to rest his decision "on any such flimsy foundation as some of the scientific demonstrations in these records". This observation becomes peculiarly relevant when two of the three members of an advisory committee are also members of the N.A.A.C.P.

this Court has great respect for the decision of the New York Court of Appeals in reviewing the Commissioner's administrative conduct in carrying out the educational policies of New York State, it is not bound thereby in the determination of whether such conduct violates the constitutional rights of others. The test for arbitrariness in relation to the educational policies of New York is not necessarily the same as the test for arbitrariness in determining whether there has been a violation of the Fourteenth Amendment. "The finality rule does not, of course, extend so far as to allow the Commissioner to authorize or condone a violation of the State or Federal Constitutions."[39] Administrative agencies, being creatures of State legislatures, are, however, presumed to act within their constitutional power.[40] The Court has no right to inject itself in the supervision of State schools unless there is a clear disregard of plaintiff's constitutional rights since " * * * any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land."[41]

### III

▉▉▉ Inasmuch as the Commissioner's determination is supported by the opinions of a committee and by other expert opinion, the Court is not in a position to say that his action is constitutionally arbitrary. Whether the Court agrees with the Commissioner's action is irrelevant.[42] The emphasis in this case is not on race but on equal opportunity for minority groups. While classifications based on race alone are "constitutionally suspect" under the Equal Protection Clause, such a classification is not proscribed if it is necessary to the accomplishment of a permissible State policy.[43] The Commissioner has determined that such classification is necessary to effectuate the State's policy of equal educational opportunities and he has the support of expert opinion and the New York Court of Appeals. Under the circumstances this Court is not justified in interfering with that conclusion.

Today the Woodfield School is 91% Negro. All that is done here is a reorganization of the attendance zones with respect to grades kindergarten through 5 in order to eliminate excessive imbalance. By the Commissioner's action, the plaintiff is not required to attend a school which, under similar circumstances, other students, regardless of race, are not also required to attend. The motivation is not discrimination but assistance to minority groups in providing equal educational opportunities which, according to the Commissioner, are not otherwise available.

Therefore, it is the Court's opinion that the complaint does not state a cause of

39. Application of Ross, App.Div. 3rd Dep't 1954, 284 App.Div. 522, 530, 132 N.Y.S. 2d 760, reversed on other grounds, 1955, Ross v. Wilson, 308 N.Y. 605, 127 N.E. 2d 697.

40. "State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. State of Maryland, 1961, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393.

41. Cumming v. County Board of Education, 1899, 175 U.S. 528, 545, 20 S.Ct. 197, 201, 44 L.Ed. 262.

42. See, e. g., Safeway Stores, Inc. v. Oklahoma Retail Grocers Ass'n, 1959, 360 U. S. 334, 79 S.Ct. 1196, 3 L.Ed.2d 1280, where it was stated that "this Court will not interpose its own economic views or guesses when the State has made its choice. * * * We are not concerned with the soundness of the distinctions drawn. It is enough that it is open to Oklahoma to believe them to be valid as the basis of a policy for its people." (pp. 341–342, 79 S.Ct. pp. 1201–1202)

43. McLaughlin v. State of Florida, 1964, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222.

action and accordingly must be dismissed and the motion for a preliminary injunction must also be denied.

Settle order within ten (10) days on two (2) days' notice.