### JIPPING v. LANSING BOARD OF EDUCATION
#### OPINION OF THE COURT

1. SCHOOLS AND SCHOOL DISTRICTS—ATTENDANCE AREAS—RIGHT TO CHANGE—RACIAL FACTORS.
   A board of education has a right to change geographical boundaries of its school attendance districts and to consider racial factors as well as other educational considerations in making such changes.

2. SAME—CONSTITUTIONAL LAW—CHANGE OF ATTENDANCE AREAS—VIOLATION OF RIGHTS—MOTIVATION OF BOARD.
   Board of education's good faith objective of providing equal educational opportunity for all is sufficient to overcome suspicion of violation of constitutional rights cast upon the board's action in altering school attendance districts on the basis of race.

---

REFERENCES FOR POINTS IN HEADNOTES

[1–4] 47 Am Jur, Schools §§ 217, 219.
   De facto segregation of races in public schools. 11 ALR3d 780.

3. SAME—CONSTITUTIONAL LAW—CHANGE OF ATTENDANCE AREAS—
VIOLATION OF RIGHTS—BASIS OF CHANGE.

> Where board of education directs the transportation of black
> students from one attendance area to another and an iden-
> tical number of white students from the other area to the
> one from which the black students are taken, in order to
> equalize the percentages of black and white students in the
> areas and to improve the educational opportunity of all, no
> constitutional rights of the students are violated, where such
> action was clearly not motivated by discrimination (Const
> 1963, art 1, § 2; art 8, § 2).

DISSENTING OPINION.

QUINN, J.

4. SCHOOLS AND SCHOOL DISTRICTS — ATTENDANCE AREAS — ALTERA-
TION — UNCONSTITUTIONAL.

> *The board of education constitutionally may not transfer stu-
> dents from one attendance area to another solely on the basis
> of race in order to accomplish racial balance (Const 1963,
> art 1, § 2).*

Appeal from Ingham, Hughes (Sam Street) and
Salmon (Marvin J.), JJ. Submitted Division 2 De-
cember 4, 1968, at Lansing. (Docket No. 5,287.)
Decided December 31, 1968. Leave to appeal de-
nied June 12, 1969. See 382 Mich 760.

Complaint by James E. Jipping and 31 others
against Board of Education of Lansing School Dis-
trict, William R. Manning and 7 others as members
of the Board of Education of Lansing School Dis-
trict to prevent transporting students to schools out
of their school attendance area on the basis of race,
color, or national origin. Judgment for plaintiff.
Defendants appeal. Reversed.

*Farhat, Burns, Treleaven & Luoma,* for plaintiffs.

*Newman & Mackay,* for defendants.

MILLER, J.  This case raises the principal issue as to whether students can be classified solely on the basis of race, even when the ultimate objective is to equalize the educational opportunity.  The board of education of Lansing school district found that it had 20.1% black students in Sexton high school, 2.2% in Eastern and 0.9% in Everett high schools. All three schools were integrated, but the imbalance was becoming more severe at the rate of 5% in the two-year period 1964–1966.  Upon recommendation of a study committee it resolved by action taken August 4, 1966, to transport black students from Sexton district to the other two districts in order to equalize the percentages and improve the educational opportunity for all.  An identical number of whites were to be transferred to Sexton.  The report to the board stated in part:

"That the board of education be requested to adopt a policy which would cause Negro pupils to be assigned in equal numbers to each of Lansing's junior and senior high schools."[1]

The board's resolution provides in part:

"An approximately equal number of Negroes in each Lansing senior high could be accomplished by transferring about 250 Negro students out of Sexton and dividing them between Eastern (115) and Everett (135).  A certain number of white students would need to be transferred to Sexton from Eastern and Everett to make room for these Negro students."

It went on to specify the areas from which only Negroes would be transferred from Sexton to East-

---

[1] It is interesting to note, however, that Eastern had more Mexican students than either Sexton or Everett.  The study also tabulated Orientals and American Indians, but they were very minute in number.

ern and Everett. It also specified areas from which students would be assigned to Sexton. It did not specify that only whites in those areas would be transferred. Presumably they were all-white areas. In some of these areas transportation was already required.

The board's adoption of this policy was consistent with the mandates of the Michigan State Board of Education and the Michigan Civil Rights Commission, which provide in part as follows:

"Local school boards must consider the factor of racial balance along with other educational considerations in making decisions about selection of new school sites, expansion of present facilities, reorganization of school attendance districts, and the transfer of pupils from over-crowded facilities."

It is clear that the board had a right to change geographical boundaries of its school districts and to consider racial factors along with other educational considerations in making such changes. *Mason* v. *Flint Board of Education* (1967), 6 Mich App 364. It is contended that the *Mason Case* is not controlling because the action of the Lansing board was taken solely on the basis of race. If we were to examine only art 1, § 2 of the Michigan Constitution of 1963, the decision would be clear because that section covers discrimination *against*. It provides as follows:

"No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin."

However, art 8, § 2 of the Michigan Constitution provides:

"Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin."

The word "against" is not used in this section. This provision was the basis for the ruling of the trial court sitting *en banc*. There also is support in the decisions of the United States Supreme Court construing the equal protection clause (US Const, Am 14, § 1) that any classification based on color is improper. Justice Harlan in his dissent in *Plessy* v. *Ferguson* (1896), 163 US 537, 559 (16 S Ct 1138, 41 L Ed 256) said:

"Our Constitution is colorblind, and neither knows nor tolerates classes among citizens.

"The law regards man as man and takes no account of his surroundings or his color when his civil rights, as guaranteed by the supreme law of the land, are involved.    *    *    *"

And in a more recent decision, the Supreme Court in *Goss* v. *Board of Education* (1963), 373 US 683, 686 (83 S. Ct 1405, 10 L Ed 2d 632), citing and quoting *Steele* v. *Louisville & Nashville Railway Company* (1944), 323 US 192, 203 (65 S Ct 226, 89 L Ed 173), stated: "*    *    * racial classifications are 'obviously irrelevant and invidious.'" One therefore can make a substantial argument for the position that regardless of the ultimate beneficial end, the means makes the action void *per se* because it is based on race.

A more substantive test, however, is provided by *Olson* v. *Board of Education* (ED NY, 1966), 250 F Supp 1000[2] where the court ruled that such classification merely makes the action *suspect* and the court must examine the ultimate motivation to deter-

---

[2] Appeal dismissed as moot since the complaining student graduated from the school involved.    367 F2d 565.

mine whether constitutional rights have been violated. It said at page 1010:

"The emphasis in this case is not on race but on equal opportunity for minority groups. While classifications based on race alone are 'constitutionally suspect' under the Equal Protection Clause, such a classification is not proscribed if it is necessary to the accomplishment of a permissible State policy. The Commissioner has determined that such classification is necessary to effectuate the State's policy of equal educational opportunities and he has the support of expert opinion and the New York Court of Appeals."

The suspicion here is overcome by the board's good-faith objective, that of providing equal educational opportunity for all. The true issue was stated in *Olson, supra,* at 1006 as follows:

"The issue then is whether racial imbalance in public schools, *per se,* under certain circumstances creates unequal educational opportunities for minority groups and if so, may it be corrected without infringing the constitutional rights of others."

The court in the *Olson Case* answered both of these questions affirmatively by its result.

The "colorblind" test of Justice Harlan in *Plessy, supra,* was answered in *United States* v. *Jefferson County Board of Education* (CA 5, 1966), 372 F2d 836, 876, as follows:

"[T]he Constitution is not this color blind.

"The Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to

undo the effects of past discrimination. *The crite-
rion is the relevancy of color to a legitimate govern-
mental purpose.*" (Emphasis added.)

The court cited examples such as jury selection,
voter registration and the census where race must
be considered. It went on to state at page 877:

"Here race is relevant, because the governmental
purpose is to offer Negroes equal educational oppor-
tunities. The means to that end, such as disestab-
lishing segregation among students, distributing the
better teachers equitably, equalizing facilities, se-
lecting appropriate locations for schools, and *avoid-
ing resegregation* must necessarily be based on race.
School officials have to know the racial composition
of their school populations and the racial distribu-
tion within the school district. The Courts and
HEW cannot measure good faith or progress with-
out taking race into account. 'When racial imbal-
ance infects a public school system, there is simply
no way to alleviate it without consideration of
race.'" (Emphasis added.)

The *Jefferson Case, supra,* is a desegregation case
and like *Brown* v. *Board of Education* (1953), 347
US 483 (74 S Ct 686, 98 L Ed 873) *must be read*
with that situation in mind.[3]

Michigan adopted the motive test outlined by *Jef-
ferson, supra,* in *Mason,* at page 370:

"The intent of the Flint board of education was
to attempt in good faith to provide equal educa-

---

[3] Likewise, the HEW Guidelines are of only incidental relevance.
None of the subject schools would be considered segregated within
the Federal Aid definition of over 50% Negroes. (See General
Statement of Policies under Title VI of the Civil Rights Act of
1964 Respecting Desegregation of Elementary and Secondary School,
United States Office of Education, Department of Health, Education
and Welfare, April 1965, cited in full in *Price* v. *Denison Independent
School District Board of Education* (CA 5, 1965), 348 F2d 1010,
1015, and see Revised Statement of Policies under Title VI, March,
1966.)

tional opportunities by the correction of racial im-
balance. There was no effort made to conceal this
consideration from the public. The board admitted
in open hearings that racial balance was *one* of the
criteria used in fixing the boundary lines.

"Since 1867 it has been the policy of this State
to prohibit unjust discrimination in determining the
right of a child to attend any school."

Such inquiry into the motive for the classification
was made in *Goss* v. *Board of Education* (1963), 373
US 683, 686 (83 S Ct 1405, 10 L Ed 2d 632). Where
the motivation and ultimate objective is to eliminate
*de facto* segregation, identification and classification
is constitutionally permissible. In *Mason,* this
Court said at page 371:

" 'The motivation is not discrimination but assist-
ance to minority groups in providing equal educa-
tional opportunities.' "

As the lower court said in later proceedings in the
*Goss Case* (1967, 270 F Supp 903):

"The court has no right to inject itself into the
supervision of state schools unless there is a clear
disregard of plaintiff's constitutional rights."

No such disregard is present here. No black student
complains and the other students are assigned by
areas alone.

This case is controlled by *Mason* v. *Flint Board
of Education, supra,* and the decision of the trial
court is reversed. No costs, a public question being
involved.

T. G. KAVANAGH, P. J., concurred with MILLER, J.

QUINN, J. (*dissenting*). I cannot agree that this
case is controlled by *Mason* v. *Flint Board of Edu-*

*cation* (1967), 6 Mich App 364. *Mason* decided that a board of education may consider racial balance as one of the criteria in establishing boundary lines of high school areas. It decided nothing more.

The question presented by Jipping is whether a board of education may transfer students from one attendance area to another solely on the basis of race in order to accomplish racial balance. The trial court said no, and, on the basis of *Goss* v. *Board of Education* (1963), 373 US 683 (83 S Ct 1405, 10 L Ed 2d 632) and on Const 1963, art 1, § 2, I vote to affirm the trial court.

The feeling of inferiority generated by separating school children from others of similar age and qualifications solely because of their race, *Brown* v. *Board of Education* (1953), 347 US 483 (74 S Ct 686, 98 L Ed 873, 38 ALR2d 1180) is the same whether the purpose is segregation or to accomplish racial balance.

I find no merit in defendants' argument relative to plaintiffs' lack of standing in this case.

Affirmed.