Abraham J. Gellinoff, J.
This is a CPLR article 78 proceeding in which petitioner, the Board of Education of the City of New York, seeks a judgment compelling respondents, the executive and legislative authorities of the city, to appropriate for petitioner in the city’s 1976-1977 budget the amount required by chapter 132 of the Laws of 1976, commonly called the Stavisky-Goodman Law. Petitioner asserts that the city has appropriated some $115 million less for education than that law requires.
The city contends that the court should not mandate compliance with the Stavisky-Goodman Law because the law, which was passed without a message of necessity (see NY Const, art IX, §2, subd [b], par [2]), violates the home rule provisions of article IX of the State Constitution, and is therefore void. The city also complains that the law is so vague that it is impossible to comply with it. Additionally, the city argues that the law, passed over a veto by the Governor, was not validly enacted, since the State Senate initially voted to sustain the Governor’s veto, and lacked the power thereaf *181 ter to reconsider the question. Finally, the city contends, petitioner has failed to comply with various provisions of law requiring that its budget estimate and request be submitted prior to September 1, 1975.
To label the Stavisky-Goodman Law controversial is to understate. Vehement arguments with respect to the wisdom of the enactment have been made to this court both in the papers submitted by the parties, and in the public press (see Shanker, Where We Stand, New York Times, Aug. 8, 1976, § 4, p 7; editorial, New York News, Aug. 10, 1976, p 29). It must therefore be emphasized that the desirability of the Stavisky-Goodman Law is not before this court. It is not within the court’s authority to decide whether, as Mayor Beame asserts, enforcement of the statute would have a "terminal” impact on the city’s ability to continue to function (see article by Nelson Seitel, NYLJ, Aug. 3, 1976, p 1, col 2), or whether, as Deputy Chancellor Gilford maintains, enforcement of the statute is essential to avoid "serious impairment” of petitioner’s "ability to provide for the education of the children of the City.” Those are matters for the Legislature to determine. The court must not permit, and has not permitted, such arguments to influence its resolution of the issues properly before it. And those issues deal not with policy, or politics, but power. Did the Legislature have the power to enact this law? And, if it did, did it properly exercise that power so as to enact a law capable of enforcement? If so, and even if it be an evil law, this court must enforce it. If not, and even if it be a vital law, this court may not enforce it.
The Stavisky-Goodman Law amended section 2576 of the Education Law. It provides that, in its annual expense budget, the City of New York must "appropriate” for public elementary and secondary education at least "an amount equal to the average proportion of the total expense budget of such city, as amended, appropriated for the purposes of the city school district of such city in the three fiscal years of such city immediately preceding the [current] year.” (L 1976, ch 132, §1.)
But this law was not enacted in a vacuum. To understand and apply it, it is necessary to view it within the framework of other statutes, enacted by the same Legislature, which regulate the city’s finances.
The current financial plight of the City of New York has for some time been a matter of common public knowledge, and of *182 great public concern. This concern found articulation in a 1975 enactment of the Legislature, upon a message of necessity, which entirely restructured the city’s financial system.
The Legislature found (L 1975, ch 868, § 1) that "the city is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders of outstanding securities.” Further, it found that the results of such inability to obtain funds would "effectively force the city to stop operating as a viable governmental entity and create a clear and present danger to the health, safety and welfare of its inhabitants.” Moreover, it declared that such danger "is a matter of substantial and imperative state concern.” Accordingly, it concluded that: "This situation is a disaster and creates a state of emergency. To end this disaster, to bring the emergency under control and to respond to the overriding state concern described above, the state must undertake an extraordinary exercise of its police and emergency powers under the state constitution, and exercise controls and supervision over the financial affairs of the city of New York, but in a manner intended to preserve the ability of city officials to determine programs and expenditure priorities within available financial resources.”
The result of these findings was the New York State Financial Emergency Act for the City of New York (L 1975, ch 868).
The act prohibits the city from borrowing or expending funds except in compliance with its provisions (§ 3, subd 1). The act further provides for the creation of the New York State Emergency Financial Control Board (§ 5), having the authority to pass upon a financial plan to be submitted to it by the city. Once the financial plan has been submitted and approved, the city must tailor its budget to comply with the plan, and may not deviate from it without the approval of the board (§ 7, subd 1, par e, cl [i]; § 8, subd 3, par g).
Moreover, the expense budget of the city, and of each of its "covered organizations”, including the board of education (§ 2, subd 5), may not exceed the "level contained in the expense budget adopted by the city * * * for the fiscal year ending June thirtieth, nineteen hundred seventy-six, as modified or amended to the effective date of this act [September 9, 1975]”, unless such increases are approved by the Emergency Financial Control Board (§ 8, subd 3, par c, cl [iv]).
Thus, by the Financial Emergency Act, and by the financial plan which has since been adopted pursuant to the act, the *183 Legislature, and the Emergency Financial Control Board have placed an absolute maximum on the city’s total expense budget. Therefore, any mandate compelling the city to allocate a proportion of its total budget to one particular budget line has the direct and automatic effect of reducing, by an equal amount, one or more other budget lines. For the city may not now, as it might have in the past, borrow, or engage in deficit spending, or increase its total expense budget, in order to meet all the requirements of its basic municipal functions.
Based upon petitioner’s calculations, the Stavisky-Goodman Law requires allocation to petitioner of some 21% of the city’s total expense budget, an amount totaling some 30% of its controllable budget. For the Legislature to compel the city to allocate such a substantial portion of its fixed expense budget to one item has a direct effect on every other item in the budget. To comply with this mandate, the city will be required by the Financial Emergency Act to make further, unanticipated and involuntary decreases in areas of the budget "ranging from police and fire protection, to health care, housing, the maintenance of the municipal hospital system, to care for the disabled, the poverty stricken, the children and the destitute”. Thus, the Stavisky-Goodman Law dictates the expenditure priorities and programs for the city, and thereby directly interferes with its property, affairs and government.
The Constitution of the State prohibits the Legislature, except as otherwise provided, from interfering with "the property, affairs or government of a local government” (art IX, § 3, subd [a], par [3]). One of the exceptions provided in the Constitution is the duty of the Legislature to "provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated” (art XI, § 1). However, this power of the Legislature to provide for education does not extend to the point of compelling the city to sacrifice its other basic municipal functions. And, in the context of the strictures imposed on the city by the Financial Emergency Act, that is precisely what the Stavisky-Goodman Law requires.
The court does not suggest that because of the city’s fiscal crisis, and the Financial Emergency Act, the Legislature is impotent to provide for education, or that any statute which might coincidentally increase the city’s education budget would necessarily conflict with the city’s constitutional right to govern its affairs. Wholly different issues would have been *184 presented had the Legislature chosen, for example, to require the city to maintain certain minimum educational standards, and to provide adequate funds therefor. The relationship to education would then be arguably more direct, and the impact on the other "property, affairs or government” of the city arguably more attenuated.
Instead, the Stavisky-Goodman Law not only impinges directly on the city’s governmental functions, but its effect on education is only indirect. For, by compelling appropriation for education on the basis of a fixed proportion of the city’s expense budget, the law has mandated that financing of education be based not upon educational needs, nor the size nor desired quality of the school system, but solely on the size of the city’s total budget. That such method of allocation has only a theoretical effect on education is perhaps best dramatized by the unchallenged assertion in Mayor Beame’s affidavit that this past fiscal year, despite the budget cuts that assertedly prompted the Stavisky-Goodman Law, the board of education actually spent some seventeen million dollars less than the amount its budget for the year provided.
In sum then, this court concludes that under current financial conditions, and under the budgetary restrictions which the Legislature has already imposed on the city by means of the Financial Emergency Act, the Stavisky-Goodman Law, insofar as it may be read as requiring the expenditure of a fixed and substantial proportion of the city’s budget, violates the State Constitution and is void.
Moreover, petitioner’s claim — that so far as the budget for education is concerned, the Stavisky-Goodman Law, by compelling the "expenditure” of funds in accordance with its formula supersedes the Financial Emergency Act — is not supported by the language of the Stavisky-Goodman Law, nor by its legislative history.
Nothing in the language of the Stavisky-Goodman Law evinces an intent to partially repeal the Financial Emergency Act by modifying the authority given the city and the Emergency Financial Control Board to devise a financial plan and determine the city’s financial priorities. As a rule of statutory construction, a court must avoid, if possible, an interpretation of a statute which repeals another by implication (Board of Educ. v Allen, 6 NY2d 127, 141-142). This rule is particularly applicable here. The court will not assume that the StaviskyGoodman Law, a single one-paragraph law, has repealed by *185 implication a complex legislative enactment. It certainly will not assume that, barely seven months later, the Legislature repudiated its carefully and specifically stated purpose to "exercise controls and supervision over the financial affairs of the city of New York, but in a manner intended to preserve the ability of city officials to determine programs and expenditure priorities within available financial resources” (L 1975, ch 868, § 1), and that it took such drastic action, mutely, by implication.
This is especially so because the Stavisky-Goodman Law is susceptible of judicial construction without the necessity of construing it as partially repealing the Financial Emergency Act by implication. For the two statutes are not in conflict. The Stavisky-Goodman Law is not by its language self-executing. It does not by its terms dispense with the need for the Emergency Financial Control Board’s approval of the proposed education budget. Nor does it require the "expenditure” of funds in accordance with its formula. It simply mandates that the city make an "appropriation”. Interpreted within the framework of the Financial Emergency Act, the StaviskyGoodman Law is an expression of policy and exhortation.
Petitioner’s contention that notwithstanding the wording of the Stavisky-Goodman Law, the legislative debates establish an intent to supersede the Financial Emergency Act with regard to expenditures for education, is unpersuasive.
Debates are generally not a useful tool in determining legislative intent. They reflect only the stated views of the legislators who participate, but do not serve as an indication of the combined opinions of their colleagues (see McKinney’s Cons Law, of NY, Book 1, Statutes, § 125). And, unlike an opinion written by an adjudicating body, legislative debates, often extemporaneous, constitute arguments made by those attempting to persuade, and not formal declaratory pronouncements explaining a determination.
Besides, here, the legislative debates provide conflicting interpretations of the intent of the Stavisky-Goodman Law. Although some legislators are quoted as stating their opinion that the law mandates the expenditure of sums in accordance with its formula, others, including one of the law’s sponsors, indicate a different view.
Thus, during the debate in the State Senate on the question of overriding the Governor’s veto, Senator Goodman urged his colleagues to override the veto, not to compel compliance with *186 the provisions of the law, but rather, to set the stage for some budgetary increase for education through future negotiations. Thus, he argued that overriding the veto "would signal the beginning in earnest of a new phase of seeking a compromise which would prevent the placement upon the City of New York of a mandate to expend $150 million for the schools alone. We know that is not advisable and we realize that the city’s cupboard is far closer to being bare than it ever has been in the last decade. We do not wish to dismantle police and sanitation and fire services. We do not certainly wish to dismantle CUNY, which paradoxically is of course a UFT organized entity. We seek to find some modest, some modicum of give and assistance, perhaps to the tune of $30 million to $40 million per participant which can add up to the aggregate which is needed to solve this problem * * *. So I respectfully suggest we can solve this problem after the veto override puts the steam under it, and we must then go on to finish the bigger job, which is to help unburden the fiscal crisis which once again looms over the city. Therefore I respectfully suggest that there is no alternative. We sought it and we sought it and we sought it, but there is simply no alternative to overriding this veto tonight and getting on with the urgent business at hand.”
In a similar vein, Senator Burstein stated: "My vote to override the Governor’s veto is a vote that proceeds from my belief not that we must restore $150 million by cutting mayoral agencies, but that we must foreclose next year’s cut. I am not sure I would like to see some money returned, but I have spoken also with the Board of Education members and I have spoken also with the teachers and with parents, and I am not getting from those people the statement that you must take away from everybody else and give to us immediately. What I am getting from those people is the feeling that unless we have something to negotiate with, unless there is in fact in front of us a live measure which mandates a certain commitment to education, then that commitment made verbally by the Mayor to prospectively restoring or maintaining the level of education, the commitment of the Mayor is in fact a nugatory one, a meaningless one.”
And, during debate in the Assembly, Assemblyman Blumenthal characterized the "purpose” of the Stavisky-Goodman Law as being "to bring to the negotiating table those people who have the power to see to it that the moral obligation by *187 which I believe every man and woman in this Chamber lives by is fulfilled”.
The picture that emerges from the legislative debates is therefore at best cloudy. But at least some of the legislators voted to override the veto on the assumption that the law was not intended to mandate the actual expenditure of the sums now sought by petitioner, but rather that passage of the law would act to force the interested parties to negotiate. There is plainly lacking a showing of intent by the Legislature to partially repeal the Financial Emergency Act.
The language of the Stavisky-Goodman Law, and its legislative history, then, support the court’s conclusion that it does not supersede the Financial Emergency Act with respect to expenditures for education, but rather, that it expresses the Legislature’s strong view that the city, the Emergency Financial Control Board and petitioner should arrive at an increased education budget through negotiation.
The city also argues that the Stavisky-Goodman Law is so incomprehensible and indefinite as to render it invalid and unenforceable. The law provides that the proportion of the city’s budget allocated to education must be the same as the average proportion so allocated in the city’s budgets "as amended” during the last three years. The city argues that since budgets are amended hundreds of times during each fiscal year, it is impossible to determine what the StaviskyGoodman Law envisions as a budget "as amended”.
Petitioner maintains that although the Stavisky-Goodman Law is silent as to a cut-off date for amendments to the budget, the Legislature intended that the statute be interpreted as speaking of a budget "as amended” as of March 15 of each fiscal year. Petitioner relies upon other laws which specifically provide for a March 15 cut-off date, and on the recent attempt by the Legislature to amend the StaviskyGoodman Law to specifically provide for a March 15 cut-off date.
But the court may not read a March 15 cut-off date into the statute in the face of silence in the statute. Indeed, the fact that the Legislature deemed it necessary to seek to amend the law to specify such date — the bill is apparently awaiting action by the Governor — indicates the Legislature’s awareness that such specificity was lacking and needed.
Nevertheless, the statute is not impermissibly indefinite in this regard. In the absence of language to the contrary, the *188 court must interpret the phrase "as amended” to mean "as finally amended”. Such interpretation would seem also to comport with petitioner’s understanding of the intent of the Stavisky-Goodman Law. For, if the purpose is to preclude disproportionate decreases in the education budget, it would seem that the final budget, rather than any intermediate budget, would be the most appropriate yardstick with which to measure the proportion of past years’ budgets allocated to education.
However, as both parties agree, the city’s budget for a fiscal year is subject to amendment for a period of up to six months after the end of that fiscal year. Thus, the proportion of the final budget allocated to education for one of the measuring years — fiscal year 1975-1976 — is still undetermined, since that budget may continue to be amended for several more months. Therefore, the statute is, at present, incapable of implementation.
The city further challenges the Stavisky-Goodman Law on the ground that it was not validly enacted. Section 7 of article IV of the State Constitution provides, in part, that: "Every bill which shall have passed the senate and assembly shall, before it becomes a law, be presented to the governor; if he approves, he shall sign it; but if not, he shall return it with his objections to the house in which it shall have originated, which shall enter the objections at large on the journal, and proceed to reconsider it. If after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill, it shall be sent together with the objections, to the other house, by which it shall likewise be reconsidered; and if approved by two-thirds of the members elected to that house, it shall become a law notwithstanding the objections of the governor. In all such cases the votes in both houses shall be determined by yeas and nays, and the names of the members voting shall be entered on the journal of each house respectively.”
Upon the return of the Stavisky-Goodman bill to the Legislature following the Governor’s veto, the Assembly "proceed[ed] to reconsider it”, and two-thirds "agree[d] to pass the bill”. However, when the bill was sent to the Senate, and that body "proceed[ed] to reconsider it”, it was not "approved by two-thirds of the members” of the Senate. A roll-call vote was taken, and after completion of the vote, the President of the *189 Senate announced that the Governor’s veto had been sustained. Subsequently, a motion was made in the Senate to reconsider the question and that motion was laid on the table. Some five days after the Senate had "reconsidered” the bill and had voted by yeas and nays not to approve the bill, the Senate voted on the motion to reconsider the question, and, this time, by the necessary two-thirds majority, "approved” the bill. The city contends that the Senate’s first vote acted to sustain the veto, and that it lacked the power to reconsider the prior vote.
The language of section 7 of article IV mandates a single "reconsideration” of a bill following a Governor’s veto. And, while the Constitution uses general language on other matters of procedure (see art III, §§ 14, 23), it is specific as to how such reconsideration shall be conducted, and the determination recorded. The direction in the constitution that the votes be "determined by yeas and nays, and the names of the members voting shall be entered on the journal of each house,” indicates that such "yeas and nays” be final and determinative. Otherwise, these specific directions would be rendered superfluous, which they are not (see People ex rel. Pond v Board of Supervisors of Monroe County, 65 Hun 263), and it would be possible for one house of the Legislature, having by its formal vote sustained a veto, to nevertheless hold the matter hostage, indefinitely, subject to enactment at some undetermined future date. This is a result which the language of the Constitution seeks to prevent. The Constitution provides for one reconsideration after a Governor’s veto, and one reconsideration only.
As may be expected, scant precedent exists with respect to this question. The primary ruling directly in point is a determination made in 1844 by the Speaker of the House of Representatives of the Congress of the United States, ruling out of order a motion to reconsider a vote which failed to override a veto by the President, despite House rules generally permitting reconsideration. The ruling was challenged by Representative John Quincy Adams, and the Speaker explained that: "There was, however, a power higher than the rules which provided that whenever a bill was returned by the President of the United States with objections it was the duty of the House to proceed to reconsider it. Without that provision of the Constitution the House could never again have touched the bill; and the requirement of the Constitution *190 having been complied with, there was no power in the House to touch the subject again.”
After debate, the ruling by the Speaker was sustained. Since that time, that ruling has been uniformly followed in the House of Representatives (see Jefferson’s Manual and Rules of the House of Representatives [1973], § 106; Cannon’s Procedure in the House of Representatives [1963], p 468; V Hinds’ Precedents of the House of Representatives [1907], § 5644; but, see, Kay Jewelry Co. v Board of Registration, 305 Mass 581; State ex rel. Coleman v Lewis, 186 SE 625 [SC]).
Section 7 of article IV of our State Constitution is virtually identical to that provision of the United States Constitution (art I, § 7, subd 2), regarding passage of a bill over a veto.
Moreover, section 8 of rule V of the Senate’s own rules provides that a question shall "not be reconsidered more than once.” When, following the return of the bill from the Governor pursuant to section 7 of article IV of the Constitution, the Senate voted on the bill, it was complying with the constitutional mandate to "reconsider it”. Its vote not to "pass the bill” constituted its first "reconsideration”. The subsequent motion to "reconsider” was, in reality, a request for a second "reconsideration”. And, when, five days later, it ultimately did "agree to pass the bill,” that was upon this second reconsideration.
The passage of the bill after this second reconsideration was thus prohibited not only by the State Constitution, but by the Senate’s own rules. The vote overriding the veto was therefore a nullity, and the Stavisky-Goodman Law is not a law.
Finally, the city’s objection that the Board of Education failed to timely file its estimate and requested budget, merits no discussion. The terms of the Stavisky-Goodman Law would provide a minimum appropriation for education regardless of the amount requested.
In conclusion, therefore, this court finds that the StaviskyGoodman Law was enacted by the Legislature in violation of the restrictions placed upon it by the State Constitution and the Senate rules; that its terms violate the provisions of article IX of the State Constitution; and that, moreover, it is not enforceable since it merely bespeaks legislative policy and exhortation, and is by its terms incapable of implementation at this time.
*191 Accordingly, the application for a judgment pursuant to CPLR article 78 is denied, and the petition is dismissed.